THE UNDERWRITER.

(District Court, D. Massachusetts. August 1, 1902.)

No. 1,007.

1. MARITIME LIENS—REPAIRS AND SUPPLIES—AMERICAN RULE.

Maritime liens for supplies and repairs are of ancient origin, and were recognized both in England and on the continent to bind both foreign and domestic vessels. Both have generally been bound upon the continent, and also by the admiralty law of England, but such law was denied enforcement by writs of prohibition from the English common-law courts in the case of foreign and domestic vessels alike. In the American admiralty law there has been a general tendency to hold a vessel liable for her repairs and supplies, unless the owner, to the knowledge of the furnisher, has declined to allow the lien. This general and imperfectly developed rule is subject to exceptions, presumptions, and counter presumptions. Where the owner, to the knowledge of the furnisher at the time of supply, refuses to allow the lien to arise, it does not exist or is deemed to be waived.

2. SAME—CONSTRUCTION OF CHARTER—NOTICE OF LIMITATION OF MASTER'S AUTHORITY.

A charter party providing that the charterer shall provide and pay for all the coal used by the vessel, and that the master, although appointed by the owner, shall be under the orders and direction of the charterer as

---

¶ 1. Maritime liens for supplies and services, see note to The George Dumois, 15 C. C. A. 679.

regards employment, agency, or other arrangements, is not merely a contract between the parties which binds the charterer to reimburse the owner for coal paid for by the latter, but is also a limitation on the authority of the master to bind the owner or the vessel for such supplies; and no lien upon the vessel exists in favor of a libelant who supplied coal on the order of the master in a foreign port, but which was not a port of distress, and was merely across the river from the home port, where the owner resided, and no actual necessity was shown for pledging the credit of the vessel, and where libelant knew the vessel to be under charter, and was put upon inquiry as to the terms of the charter.

In Admiralty. Suit in rem to establish and enforce a maritime lien for supplies.

Nichols & Cobb, for libelant.

Frederic Dodge and Frederic Cunningham, for respondent.

LOWELL, District Judge. This was a libel filed against the tug Underwriter for the value of coal furnished her in a foreign port while under charter to the Atlantic Transportation Company. The charter provided that the charterer should pay for coal. The coal was furnished upon the order of the master. The evidence is somewhat conflicting, but I find that the following facts are established:

The libelant, through its officers and agents, either knew that the Underwriter was under charter to the transportation company, or knew enough to put upon inquiry a reasonable man who wished to know if there was such a charter. The libelant did not know that the charter expressly provided for the furnishing of supplies by the charterer, but it was put upon inquiry concerning this fact also, and might easily have ascertained it. The coal was ordered by the master. The libelant charged the coal to the tug and owners, and in fact looked to the tug for payment. There was no contract made between the charterer and the libelant to furnish the coal. The correspondence between the two, if any existed, amounted to no more than a request by the charterer for the libelant's price list. If the libelant had a right to look to the vessel for the coal, it did not waive that right by any act. No actual necessity for pledging the credit of the vessel was shown. I do not think that the conversation between Capt. Wiley and Mr. Abernethy regarding the credit given to the tug was proved. Under these circumstances the court has to determine if a lien exists where, in a foreign port, necessary supplies are ordered by the master of a vessel known by the libelant to be under a charter which provides for the payment for supplies by the charterer. No reference has been made to any statute, and the case must be decided by the general admiralty law. This question has not always received the same answer in the courts of the United States, and similar answers have not always rested upon like grounds. For this reason a somewhat extended examination of the history of the lien of a materialman upon a vessel seems desirable.

The admiralty law on this subject administered in the federal courts is derived rather from the civil law and the maritime law of continental Europe than from the common law of England. Dig. 42, 5, 26, 34, provides, "Qui in navem extruendam, vel instruendam, credidit, vel etiam emendam, privilegium habet." "Quodquis navis fabricandæ,

vel emendæ, vel armandæ vel instruendæ causa, vel quoque modo crediderit, vel ob navem venditam petat, habet privilegium post fiscum." See Dig. 49, 14, 17. If this language be taken literally, and if "privilegium" be translated "lien," then, so far as the Roman law is concerned, the question is answered, and a lien is created by a mere contribution to the construction or maintenance of a vessel, irrespective of the authority of the person ordering the work or supplies. The lien depends upon the fact that the materialman has contributed to the existence or maintenance of the object upon which he claims the lien. See, also, Dig. 20, 4, 5. This construction has been put upon these passages by some civilians and by some courts of England and the United States. See The Sandwich, 1 Pet. Adm. 233, note (s. c. Fed. Cas. No. 13,409). This seems to have been the opinion of Mr. Justice Story. See The Nestor, 1 Sumn. 73, 79, Fed. Cas. No. 10,126; The General Smith, 4 Wheat. 438, 4 L. Ed. 609. But in The Young Mechanic, 2 Curt. 404, Fed. Cas. No. 18,180, Mr. Justice Curtis pointed out the difference between "lien" and "privilegium." A privilege may mean no more than a general priority in the distribution of the debtor's assets. See Desjardins, Droit Com. Mar. 1, 213. See, also, Pardessus, Lois Mar. I, p. 98, note 4, page 113, note 1, and page 119, note 3, where the author states that, according to the best opinion, an express agreement is necessary to create the lien mentioned in the texts of the digest above quoted. If this be true, then these texts prove no more than that an express hypothecation of the vessel to pay the debt of a materialman gives priority over other liens, hypothecations, and conveyances, and is inferior only to the fisc. Under this construction of the Digest, no lien exists by force of the repairs and supplies without an express hypothecation of the vessel. The authority to hypothecate, therefore, must be important.

Another text of the Digest seems to have affected more considerably the later continental law regarding the rights of the materialman. Dig. 14, 1, 1–7. "De exercitoria actione." This text deals with the authority of the master to bind the owner of the vessel for repairs, supplies, seamen's wages, etc., and his authority to borrow money for these purposes. It declares how far the owner is bound if the master misapplies the money borrowed; and it makes the right of action against the owner to depend, not upon the actual maintenance of the ship, for the right of action may exist where the ship gets no benefit, but upon the authority of the master to contract, reasonably supposed to exist by the materialman or lender. How far this text deals with a lien upon the ship, rather than with the personal liability of the owner, is not clear.

The maritime law of England was affected more directly by the maritime laws of continental Europe than by the Roman law. As applied in the English admiralty, the civil law was usually, though not always, first passed through a later continental medium. It is to "the ancient collections of sea laws," as Mr. Justice Curtis calls them, rather than to the Digest, that reference is commonly made by modern judges; and it was these collections, rather than the civil law at large, by which the commons of England in the fifteenth century

wished the English courts of admiralty to be governed.  1 Rolle, Abr.
528; 3 Rolls Parl. 498.  Of these laws, in their relation to the Ro-
man law and to maritime liens, Mr. Justice Curtis said in The Young
Mechanic, 2 Curt. 404, 408, Fed. Cas. No. 18,180:

"Whether the texts of the Roman law were misunderstood, and so were the
source of the existing usages, or whether it was only intended to adapt them
to those usages which had already obtained, it is certain that in the general
maritime law of Europe privileged hypothecations were tacitly conferred in
the cases in which what we term 'liens' now exist.  It is true we do not
find their precise nature described in any of the ancient collections of sea laws,
so far as I have discovered.  These laws were, generally, simple practical
rules, often partaking of the rudeness of the age in which they were compiled,
dealing rarely with abstractions, containing few definitions, and, with the
exception of the customs and ordinances of Catalonia and Arragon, collected
by Pardessus in volume 5, p. 333 et seq., and they are not laws of procedure.
In the Consulat de la Mer, the most ancient and important of all, there is no
definition of a maritime lien, nor any account of the way in which it was
to be worked out.  Its usual formula is, simply, the ship ought to be sold,
and the debt or damage paid from its price.  And so, when the personal liabil-
ity of the master is ordained, it is only said he ought to be put into the
power of the magistrate.  See chapter 289.  But that the right or privilege
of the seaman in the ship as a security for his wages (chapters 138, 193), of
the merchant for injury or loss of his goods, etc. (chapters 59, 254, 259, 227,
106, 63), or for the price of his goods sold to raise money for the necessities
of the ship (chapter 107), was a real right,—a jus in re, in contradistinction
to a mere personal privilege to be paid in a concourse of creditors,—I have
no doubt.  In the Laws of Wisbuy[1] this is clearly shown.  Emerigon (Con. a
la Grosse, c. 124, § 4) and Boulay-Paty (Cours de Droit Com. vol. 1, p. 38),
translate the forty-fifth article of these laws respecting the right of a mer-
chant whose goods have been sold to supply the necessities of the vessel, or
who has lent money for the same purpose, 'Auront special hypothèque et suit
le navire.'  See, also, 1 Pardessus, Col. des Lois Mar. 492, art. 43.  Le
Guidon (chapter 19, arts. 1, 2; Pardessus, Col. des Lois Mar. 424) denominates
such a right 'special hypothèque.' "

Many other passages in various maritime laws show that a lien
of some sort upon the ship was contemplated as the result of repair-
ing or supplying her.  By the Laws of Oleron,[2] dating from the thir-
teenth century, which had especial authority in England, Pard. I, 323,
art. 1, the master may, under some circumstances, pledge part of the
tackle of the ship in a foreign port to raise money for the needs
of the ship.  See the reproduction of the Judgments of Oleron in
the Judgments of Damme, Pard. I, 371, in the Castilian Law, Pard.
VI, 57, and in the Laws of Wisbuy,[1] art. 15, Pard. I, 471.  See the
Laws of Denmark, Pard. III, 298, 265.  By the Laws of Hamburg,
Pard. III, 352, 367, the tackle could be pledged for provisions in a
foreign port, but not the ship.  If, however, the master sold the cargo
for this purpose, as apparently he had the right to do, the owner of
the cargo sold had a lien upon the ship valid as against a purchaser.
By the Laws of Genoa, Pard. IV, 520, it is implied, if not precisely
stated, that for necessaries a master may bind the vessel, but not
the owner personally.  So the Ordinance of Trani of 1063, Pard. V,
247, permits the master to pledge the ship in case of injury by sea
peril or of capture by pirates.  By the Laws of Malta of 1597, Pard.
VI, 341, the captain can borrow in a port where the owners do not
reside by written instrument, which declares the necessity of the
borrowing.  By this instrument the ship is bound.  Other laws or

1 30 Fed. Cas. 1189.                    2 30 Fed. Cas. 1171.

rules give authority to the master to pledge for supplies, and perhaps for repairs, even in a home port, the share in a vessel of a part owner who refuses to contribute proportionally to the maintenance of the vessel. A formal hypothecation is required, and formal summons to the delinquent owner. Consolato, Pard. II, 223. See Law of Ancona 1397, Pard. V, 118. By the law of Sweden, if the other owners furnished the supplies, the delinquent owner's share was ex ipso facto hypothecated to them. Pard. III, 160.

It is not necessary even to cite the laws giving a master authority to sell part of the cargo in order to repair or provision his ship. The connection of this authority with the right to create a lien upon the ship itself illustrates, however, the nature of this lien. We may pass over, likewise, the laws which deal with the binding of the owner of a vessel by the contracts of its master acting as his agent or servant, though these last also illustrate the nature of the lien of the materialman. There are laws which deal with the lien apart from the liability of the owner. Thus, by the customs of Amsterdam, Pard. I, 420, if the cargo is sold to supply the ship, its owner has a lien for its price upon the vessel, irrespective of a change in the vessel's ownership. See the Consolato, Pard. II, 110. By the Consolato, Pard. II, 225, the master may borrow in a port where no owner is present, and there is necessity. In this case all the body of the ship shall pay the loan, and no owner shall contest it. By the Law of Sweden, Pard. III, 159, the owners can escape liability upon the master's contract by abandoning the ship,—a rule which seems to imply a lien.

These varying provisions of law, so often referred to in the judgments of English and American courts, and not exhaustively cited here, make the peculiar rights of the materialman against the ship, whatever these may be, depend in general upon the authority vested in the master, in case of need and in the absence of the owner, to deal with the owner's property. The authority of the master must be shown in order to create a lien by hypothecation. There must be sufficient evidence of necessity and of the owner's absence, for when the owner is present the necessity is his, and not that of the master or ship. For these reasons it has been supposed that the general maritime law gives to a materialman no lien upon a ship except in case of necessity in a foreign port. But, notwithstanding the provisions of the various continental maritime codes already referred to, there are weighty considerations which suggest that a privilege or lien or right to proceed directly against the ship was given to the materialman, which attached in a domestic port and apart from any supposed necessity. Thus the Law of Sweden, Pard. III, 169, provided that one who lent money for the construction or maintenance of a ship might take a receipt, called a "bilbref," formally acknowledged, which gave him a lien on the ship superior even to that of a bottomry bond. See the similar provision in Denmark, Pard. III, 301. See the Maritime Ordonnance of Arragon of 1340, Pard. VI, 359, which gave a lien to the materialman and laborer in the construction of a ship which had not yet sailed. See Id. 389. See, also, as to the lien of workingmen in building a vessel, Consolato, Pard. II, 59, VI, 389, and see, generally, Desjardins, I, 214–219. This appears most

plainly from the French Ordonnance de la Marine, book I, tit. 14, arts. 16, 17, Pard. IV, 345. The prior history of these provisions is given summarily in Valroger I, 79 et seq. See, also, Desj. I, 206. By this code creditors for money lent during the last voyage have priority of payment after the seamen. After them come creditors who have lent money for repairs and supplies furnished to the ship before its sailing. If the ship has not made a voyage, the workmen and the materialmen are to be paid first of all. From this it appears that all materialmen have a right against the ship superior to that of the general creditors of the owner, though the materialman in a home port is postponed to the materialman abroad. It is very unlikely that these privileges or liens thus allowed by the Ordonnance were created by it. Probably the provisions cited expressed, perhaps with some slight change, the rule of law already existing. The French code adopted substantially these provisions of the Ordonnance, but provided that the claims of the several classes of creditors should be evidenced with certain formalities. (This provision did not apply to claims of the workmen themselves.) In adopting the French code many continental countries have adopted substantially the same provisions. See Desjardins I, p. 258 et seq., 277. Upon the whole, we have considerable evidence that the continental nations, or many of them, early recognized a lien arising from the furnishing of repairs or supplies, even in the home port. There seems an increasing tendency, however, to require that the debt thus creating the lien should be evidenced in some formal manner.

It remains to consider the law of England. The English jurisprudence relating to maritime affairs is so peculiar, and its peculiarities have affected so considerably the law of maritime liens in this country, that some general remarks must be made concerning it, even at the risk of repeating the commonplaces of admiralty. The law administered by the English court of admiralty has always been in theory a complete system for the administration of justice in maritime affairs. Alone, for the most part, the court of admiralty has had the administration of this system, and that it interpreted and applied the system correctly nobody doubted. But there was grave and long-continued dispute between the court of admiralty and the other courts concerning the boundaries which separated their several jurisdictions. Each sought to restrain the other from encroachment. Sometimes the court of admiralty punished for contempt those who in cases deemed to be maritime sought relief elsewhere. Gorham v. Granger, Select Pleas in the Court of Admiralty II, p. lxviii; Corsini v. Hangar, Id. p. lxxi. Sometimes it inhibited another court directly. Sewell v. Norman, Sel. Pl. I, 75; Wellys v. Felton, Id. 78. Sometimes it did both. Legge v. More, Id. 83. On the other hand, it appears that the jurisdiction of the court of admiralty was early restrained by writs of certiorari (Sewell v. Norman, Sel. Pl. I, p. lxxvi); of supersedeas (Chapilion v. Bird, Id. I, p. lxxiv, 29; Struce v. Sleighter, Id. I, lxxv, 45. See II, p. xli); of mandamus, perhaps (see Bremer v. Porter, I, lxxv, 59); and of prohibition. After the beginning of the seventeenth century this restraint was commonly operated by a writ of prohibition, issued by the court of king's bench,

while the court of admiralty ceased to inhibit proceedings elsewhere, and was generally put upon the defensive. In some cases the privy council had intervened, and had restrained both sides, by acting as arbiter between them. Sel. Pl. II, 113. The courts of chancery and common law did not interfere with the court of admiralty because the latter was deemed to err in substantive law, but because it and its system of law were, by acts of parliament, excluded from the cognizance of many—even of most—maritime matters, which, by virtue of these acts of parliament, were held cognizable only by the courts and the system of common law. The question so much debated, how far the courts of common law were within their rights in issuing these prohibitions, need not be discussed here. From the seventeenth century onwards they could and did impose their will upon the courts of admiralty. Where the jurisdiction of the admiralty was admitted, its system of law was admitted to govern as matter of course, and the courts of common law in no wise interfered. Thus, in Tremoulin v. Sands (1697) Comb. 462, Lord Holt said:

"It does not appear here in the libel that the admiralty court hath any jurisdiction, and, wherever they have not original jurisdiction of the cause, tho' there arise a question in it that is proper for their conusance, yet that alters not nor takes away the power of the common law; but if they have jurisdiction of the original, tho' a question ariseth proper for the common law, yet they shall try that: and after sentence, if it appear that the matter contain'd in the libel is triable at common law, we will grant a prohibition."

See Greenway v. Barker, Godb. 260.

Indeed, had a court of admiralty attempted to apply to a case before it any system of law but its own, it would have erred admittedly. About 1400 the Commons asked the admiral to change this system, and to govern himself thereafter by the common law; but the request was refused. See Sel. Pl. II, p. xlii; 1 Rolle, Abr. 528. A court of equity restrains the enforcement in a court of common law of the penalty of a bond, and this practice has analogies to the treatment of the admiralty court by the king's bench. Even the granting of a prohibition to the admiralty was not always deemed to be strictissimi juris, and equitable considerations were sometimes admitted to affect the action of the court of common law. Thus, in Martin v. Green (1665) 1 Keb. 730, a prohibition was sought against a libel for a collision caused by the tide. It was urged that an action on the case was the only remedy, but Chief Justice Hyde doubted, because the owners of the offending vessel were not known, and so there was no available remedy at law. The other judges said this fact did not give jurisdiction, but finally the prohibition was granted only upon a disclosure of the owner's name, made in order that the libelant might have an effective remedy at law. See Brown v. Franklyn, Carth. 474; Anon., 12 Rep. 77. But the analogy between injunctions and prohibitions is not complete. No one disputed the jurisdiction of the common-law court to give judgment for the penalty. The prohibition by injunction applied only to the party plaintiff. On the other hand, the writ of prohibition was addressed directly to the admiralty court. Not being deprived of any part of its formal jurisdiction, the court of common law was not deemed to be aggrieved

by the practical restraint imposed upon its authority by the chancellor. The court of admiralty, on the other hand, being deprived directly of what it deemed its proper jurisdiction, protested for century after century; at times more or less successfully, at times with some popular support. It never abandoned its claim to the disputed jurisdiction, and actually entertained jurisdiction in numberless cases wherein it would have been prohibited had the respondent applied for a prohibition. For this reason the prohibitions issued by the common-law courts do not show the extent of the actual jurisdiction of the admiralty court, while the unprohibited suits in the court of admiralty do not show the limits imposed upon that court's jurisdiction by the courts of common law. This fact must be borne in mind throughout our examination, and also that a maritime lien may be denied operation for two different reasons: (a) Because it is not given by the admiralty law; and (b) because, though admitted to be given by the admiralty law, yet, in the case supposed, the admiralty law is not permitted to operate. ·

Let us next consider what was the law regarding the lien of a materialman according to that system of maritime law administered by the English court of admiralty. This is not the same thing as the right which the materialman was actually permitted to enforce in England, for the courts of common law often prohibited the court of admiralty in this respect. What was the right of the materialman according to that ideally existent, but often unenforceable, system which has been already mentioned? The printed material for the study of this system is still scanty, and ten years ago was almost wholly wanting. The publication by the Selden Society in 1892 and 1897 of two volumes of Select Pleas of the Court of Admiralty, edited by Mr. Marsden, has let in a flood of light upon questions much disputed in courts of England and America. Instead of conjecturing what may have been the practice and substantial jurisprudence of the English court of admiralty in the sixteenth century, we now know for certain by the perusal of decided cases. Hence it follows that the ordinary student of to-day may set right in some matters of history the great judges of the past. Even Mr. Marsden's selections leave us still ignorant of much that we should like to know. Outside his two volumes, we are confined to (1) statements made in later reported cases by English admiralty judges, who inherited the traditions of the admiralty, and to some extent may have had knowledge of its unprinted records; (2) casual, and often unauthorized, expressions found in publications of various sorts; and (3) reports of cases in the courts of common law where prohibitions to the court of admiralty were sought. The earliest regular English admiralty reports date from the latter part of the eighteenth century, when the courts of common law had triumphed, and the defeated court of admiralty had begun to forget how extensive was the jurisdiction it once had claimed.

To ascertain the law of maritime lien as applied by the English courts of admiralty, it is necessary first to consider briefly the nature of their process, and especially that of their process so-called "in rem." Learned judges have said that proceedings in rem in the

English court of admiralty were introduced later than proceedings in personam; that originally they were only auxiliary to the latter, had only to constrain the appearance of the real party to be charged. They are, it has been said, to be taken as analogous to proceedings by foreign attachment. See The Johann Friederich, 1 W. Rob. Adm. 37; The Merchant, Abb. Adm. 1, Fed. Cas. No. 9,434; The Dundee, 1 Hagg. Adm. 110; The City of Norwalk (D. C.) 55 Fed. 98; The Dictator [1892] Prob. Div. 304; The Gemma [1899] Prob. Div. 285. With this agrees to a considerable extent Clerke's Praxis, written in the latter part of the sixteenth century, and Zouch's Admiralty. Early cases give some support to this theory. Thus, anchors, etc., were arrested in a suit to enforce a bond to carry out a charter party, without suggestion that they were connected with the ship chartered. Fuller v. Thorne, Sel. Pl. I, 38. See, also, The John of Alen, Id. 53; Crockye v. Goods of Cruse, Id. II, 81. Seamen were permitted to enforce a claim for wages earned in one vessel against another vessel of the same owner. Thorneton v. The Elizabeth Bonaventure, Id. 131. Mr. Marsden observes generally: "The fact that goods and ships that had no connection with the cause of action, except as belonging to the defendant, were subject to arrest, points to the conclusion that arrest was mere procedure, and that its only object was to obtain security that judgment should be satisfied." Id. I, p. lxxii. Even where the vessel had been expressly hypothecated, suit was brought against both the ship and the owner, and the decree might go against the owner personally. Draper v. The Black Greyhound, Id. II, 155; Draper v. The Fortune, Id. 156. See Gale v. Brown, Id. I, 55; Harrison v. Stubbarde, Id. 62. Apparently the proceedings in these cases were substantially like those in which the admiralty took jurisdiction to collect any debt by the attachment of any goods on the Thames. Warner v. Wheler, Id. I, 117.

But the analogy thus stated between the process of arrest in the admiralty and the process of foreign attachment is not complete. As was said by Sir John Jervis in The Bold Buccleugh, 7 Moore, P. C. 267:

"The foreign attachment is founded upon a plaint against the principal debtor, and must be returned nihil before any step can be taken against the garnishee. The proceedings in rem, whether for wages, salvage, collision, or on bottomry, go against the ship in the first instance. In the former case the proceedings are in personam; in the latter they are in rem. The attachment, like a common-law distringas, is merely for the purpose of compelling an appearance; and, if the defendant appears within a year and a day, even after judgment and execution against the garnishee, and puts in bail, the attachment is at an end. If the owners do not appear to the warrant arresting the ship, the proceedings go on without reference to their default, and the decree is confined exclusively to the vessel. Many other distinctions will be found upon reference to the notes to Turbill's Case, 1 Saund. 67, note 1. It is not correct, therefore, to say, that the proceeding in rem is in all respects analogous to the proceeding by foreign attachment, and that the former is merely to compel an appearance, because the latter is undoubtedly for that purpose only."

When the cases reported in the Select Pleas are examined individually, it appears that in some of them the arrest of the vessel was something more than a process analogous to foreign attachment. This is true where the office of the admiral was promoted against

goods alleged to be forfeited. See Officium Domini v. Pirate Goods, Sel. Pl. II, 84. Here the arrest of the goods had an object other than that of obtaining security for satisfaction of judgment. So, where a prize was libeled by her captors. Gonner v. Pattyson, Id. 106. Yet the proceedings were in much the usual form, and all persons having claim were cited to appear pro interesse suo. See Officium Domini v. Goods ex a Hamburgh Ship, Id. 91. So where forfeiture was sought of a ship and goods belonging to an interloper in a monopoly. Merchant Adventurers Co. v. The Elizabeth George, Id. 150. So where a ship taken by pirates was returned to its true owner. Officium Domini v. The Eugenius, Id. 99. And so, generally, in possessory and petitory actions, where the return of ship or goods was sought by their owner. See Mason v. Trippe, Id. 117. So in cases of salvage. Again, where the ship had been expressly hypothecated, and was arrested to enforce the hypothecation, although the form of process resembled generally that employed to collect an ordinary debt, yet the arrest availed something more than to compel the owner's attendance. See Fleminge v. The Haddocke, Id. 191. Though the form of the decree might be personal or alternative, yet the hypothecation was not without effect upon the practical result of the suit. Again, by reason of the nature of maritime affairs, where the owner of the ship was unknown, the arrest gave a remedy practically unlike that of foreign attachment. If, for example, a ship had been in collision, or had been repaired or supplied on the order of her master, her unknown owner might be liable. In proceeding against the ship he need not be named. In a sense, the arrest of the ship might be no more than security that judgment should be satisfied, yet the practical result of the proceedings was not wholly like that of foreign attachment. Thus, in The Asunta [1902] Prob. Div. 150, 154, Sir Francis Jeune said:

"There is undoubtedly an old practice in the admiralty court of great value, which enables the owners of a ship or cargo in any admiralty action to sue as such,—a proceeding which would have been regarded by the courts of common law with professional horror. But the court of admiralty allowed it for a very good reason,—because what they were really dealing with was one ship against another, and, so long as you had the names of the vessels, you had really all that was material."

For these reasons, and doubtless for others, the arrest of the ship in admiralty was deemed more and more a proceeding against the ship itself. The pleadings so describe it in many cases. Indeed, as is shown by the statement of Sir Francis Jeune just quoted, the personification of a ship in the law is to some extent almost an intellectual necessity. This personification has become more and more complete in the admiralty law of England and the United States. See The Thomas P. Sheldon (D. C.) 113 Fed. 779; The S. L. Watson, Id. As time went on, the allegation made by the libelant that he had no hope of redress other than by arrest of the ship was treated as merely formal, and then abandoned. See Clerke's Praxis (Ed. 1798) p. 37, note. The tendency, probably increasing through the latter part of the sixteenth century, to treat many suits in which the defendant's goods were attached as suits brought against the ship itself, was

greatly strengthened by the action of the courts of common law in granting prohibitions to the court of admiralty. These became more common. Sel. Pl. II, p. xv. More and more the courts of common law got the upper hand. They were more jealous of the jurisdiction of the admiralty over suits in which a personal judgment was sought than where the decree was solely against the ship. The former suits were deemed encroachments, pure and simple, upon the common-law jurisdiction. The latter, it was perceived, sometimes gave a remedy where the court of common law was impotent. See Johnson v. Shippen, 2 Ld. Raym. 982. In 1632 resolutions of agreement were settled before the privy council, and signed by all the judges. The third resolution was as follows:

"If a suit be in the court of admiralty for building, amending, saving or necessary victualling of a ship, against the ship itself and not against any party by name, but such as for his interest makes himself a party, no prohibition is to be granted though this be done within the realm." Godolphin, Adm. Jur. 157; Sel. Pl. II, p. 15.

Though these resolutions were repudiated some time afterwards by the courts of common law, there is reason to believe that they were observed for a time by both parties to the contest. The court of admiralty thus abandoned to a great extent its jurisdiction over suits in which a personal judgment was sought, while it was left in the enjoyment of undisturbed jurisdiction over suits against the ship itself, where no party defendant was named in the warrant of arrest or citation. Manifestly, a suit for building, repairs, or supplies, in which no defendant was named, could be brought only against the ship built, repaired, or supplied, and so the theory was confirmed that the building, repairing, or supplying a vessel was ground for suit in the admiralty against the vessel, without naming her supposed owner. This was established further by the statutes of the commonwealth of 1648, c. 112, which provided that "the court of admiralty shall have cognizance and jurisdiction against the ship or vessel with the tackle, apparel and furniture thereof, in all causes which concern the repairing, victualling, and furnishing provisions for the setting of such ships or vessels to sea." By this act the remedy was expressly limited to the vessel repaired or supplied. See Watson v. Warner, 2 Sid. 161. The statutes of the commonwealth were avoided by the restoration, and the jurisdiction of the court of admiralty was at once narrowed by prohibition, but, as we shall see, the admiralty long asserted its former rights, even if in vain.

It seems probable, therefore, that the lien or right to proceed against the vessel for its repairs or supplies which was recognized in English admiralty arose in part from the development of the procedure of the court. There is evidence that it arose also from a recognized principle of substantive admiralty law. It is true that Mr. Marsden observes (Sel. Pl. I, p. lxxii) that "scarcely a trace appears of the modern doctrine of arrest being founded upon a maritime lien." There is considerable trace of a doctrine that a maritime lien was deemed to arise upon a ship repaired or supplied. Thus, in Draper v. The Fortune (1580) Sel. Pl. II, 156, the sentence sets out that cables were "applied and converted to the necessary and beneficial use, reparation, and preservation of the said ship, and that by reason thereof from that time

the said ship was and remained hypothecated for the payment of the price of the same things and goods, and that she now remains hypothecated." See, also, Draper v. The Black Greyhound (1578) Id. 155; Simondson v. Manelli (1597) Id. 185. In Draper v. The Busbye, Id. p. lxx, the ship is said to be tacite hypothecata for necessaries. See Page v. The Blessing of God, Id. p. lxx. In precisely what proportions these two elements, (1) the development of procedure, and (2) the recognition of a tacit or implied hypothecation, operated to produce the theory of an implied lien as it existed in the middle of the seventeenth century, cannot be determined in our present state of knowledge. An examination of the records of the vice admiralty court of the provinces of Massachusetts Bay and Rhode Island in the first part of the eighteenth century shows a condition much like that just described. Libels in personam were common. Sometimes the suit is entitled against the vessel, and the decree is in personam. Sometimes the ship is libeled because the owner or master has failed to satisfy a personal decree. Fitch v. Tudor, Rec. I, 39. In suits between co-owners, the decree is often in rem, though the action is begun personally. In suits in rem for wages the decree may be that the owner pay, and that, if he does not, the vessel shall be sold. Where the vessel is attached, her owner, if accessible, is personally cited to appear. No case has been found in which the ship is libeled for a claim unconnected with her. Recognition of the liability of the ship, as distinguished from that of the owner or master, is common. Thus, in Fitch v. Tudor, the proponents "conceive the said ship is liable to answer and make good the same upon the said master's liability." In Winthrop v. Sloop Africa, I, 132, the decree recites supplies "wherewith the said sloop is affected and for which she is liable." See Hodskins v. Sloop Argyle, I, 114. In Pemberton v. Ship Maunsell, I, 62, the ship is said not to be liable for certain claims, but leave is given to push them against a former owner. It is to be noted that in the practice of these vice admiralty courts the libel was first exhibited and read. It might pray for a personal citation, or for an arrest of the res, or for both. The monition or citation followed. In some cases the master was cited by proclamation at the mainmast of the vessel. Littleton v. James, I, 10. See The Clara, R. I. Adm. Pap. 29. For the proceedings of the colonial court of admiralty in the seventeenth century, see Records of the Court of Assistants, Colony of the Massachusetts Bay, vol. I. As the same court, composed largely of laymen, administered both admiralty and common law, confusion between the two was natural. Thus a libel brought by the master of a vessel against the vessel and owner for wages and disbursements resulted in a personal decree against the owner and an execution in common form levied on the ship. Skinner v. The Dove (1675) p. 372. See, also, Bromehall v. The John and Benjamin, p. 373; Gretson v. The Pink Expectation, Schinchinke, Owner, pp. 178, 378; and generally passim.

The admiralty jurisprudence of England thus recognized a lien of some sort, or a right to proceed against the vessel, in favor of the materialman for repairs and supplies furnished to her; and this whether they were furnished at home or abroad, in case of exceptional necessity, or in the ordinary course of operations. The earlier cases show

no distinction between foreign and domestic repairs and supplies. Lord Stowell said in The Zodiac, 1 Hagg. Adm. 320:

"In most of those countries governed by the civil law, repairs and necessaries form a lien upon a ship herself. In our country the same doctrine had for a long time been held by the martime courts; but after a long contest it was finally overthrown by the court of common law and by the highest judicature in the country, the house of lords, in the reign of Charles II."

See The Alexander, 1 Dod. 278.

Even in Lord Stowell's day, although the court of admiralty was prohibited from enforcing a lien upon a vessel in favor of a domestic materialman, yet, if the vessel had been sold for other sufficient causes, and the proceeds were in the registry of the admiralty court, that court was for a time allowed to enforce a lien upon these proceeds. See. The John, 3 C. Rob. Adm. 288. This curious survival arose from the failure of the courts of common law to prohibit the enforcement of a lien upon the proceeds, while they strenuously prohibited the enforcement of a lien upon the vessel. By the admiralty law the lien existed in both cases. It is true, as has been said, that the court of admiralty did not distinguish greatly between a lien proper for supplies and a right to attach a ship by legal process and sell her to satisfy the bill for supplies furnished her. The latter right, though different in theory, yet answers much the same purpose as a lien, and is hardly distinguishable from it, unless a question of priority arises. The suit is regarded as brought against the vessel, not to collect the owner's debts, but to enforce payment of a debt for which the vessel itself is deemed liable. The right to proceed against the ship irrespective of its owner, to hold the ship liable for what were deemed the ship's debts, was in issue, rather than the precise order in which the ship's debts were to be paid. If the ship can thus be proceeded against, a lien of some sort is recognized, though its rank is left undetermined. The case put is not that of a suit brought on a personal liability which is enforced by an attachment of the owner's property on mesne process. The primary suit is against the ship, and it has come to pass that the ship cannot be proceeded against for a debt of her owner unconnected with her. "For the common course of proceedings in the admiralty in cases of this nature is by process to arrest the ship, and 'tis that which brings in the proprietors pro interesse suo, and then the libel follows." Child v. Sands (1693) Carth. 294. See Greenway v. Barker (1613) Godb. 260; Watson v. Warner (1659) 2 Sid. 161. The lien or similar right in the vessel given generally to a materialman by the English system of admiralty law was deemed to cover repairs and supplies wherever furnished. Thus Sir Leoline Jenkins said:

"But the greatest discouragement of all is that of materialmen; such as furnish tackle, furniture, or provisions for the repairing of ships or setting of them out to sea. When they are not paid at the time appointed, they arrest the ship, which will bring all the part owners to answer for it; but if, when they declare in the admiralty, a prohibition be granted, the remedy will be against the master alone, who, tho' he bespoke the materials, is commonly not worth the 20th part of the action. And these materialmen have often offer'd to make it demonstrable before his royal highness that if the ship shall be subject to their arrest without danger of a prohibition (because the contract was upon the land) an 100 sail of ships shall be furnished and set out with more ease and less time than 5 now can be, as the practice of pro-

hibiting hath lately been. For there is not any master but may command £1,000 worth of goods upon his ticket in a morning, when the materialmen do know that they may arrest a ship with effect in case he and his owners don't come and give each materialman such money or security as will content him. Whereas, if they be forced for their remedy to common law against the master and his part owner (who are most commonly persons unknown, and at a distance), they had better keep their wares in their shops than pursue so many upon such unequal terms." "But the greatest convenience of all will be the encouragement to materialmen. If they be but secure of their action against the ship, there is nothing in their warehouse but will be forthwith furnished upon the credit of the ship. And if we may believe men of experience, this will contribute more effectually than anything to his majesty's designs for the increase of shipping and the encouragement of navigation. And if the bill before your lordship will naturally produce these effects, as it certainly will, I need not enlarge any other conveniences." Jenkins' Life, vol. I, pp. lxxvi, lxxxiii, lxxxiv.

This argument plainly shows that a personal action to be brought in the court of admiralty against the shipowner was not then desired by the supporters of the admiralty jurisdiction, but only a suit in rem against the ship for both domestic and foreign furnishings. See The Champion, Fed. Cas. No. 2,583. It is true that in 1835 the judicial committee of the privy council in The Neptune, 3 Knapp, 94, 115, said that the maritime law of England had never given a lien for domestic supplies. To this statement it must be replied that a decision of the highest court makes law, but its opinion cannot change past events. The historical error thus made by the privy council has already been demonstrated, and will still further appear.

We have next to consider what were the limits imposed upon this enforcement of the lien for repairs and supplies by courts of common law. In studying the early reports of cases of prohibition, several things must be noted: First. The report was unofficial, and was often prepared with less care than that used at the present time. The report, therefore, is not always quite intelligible. Second. The fact that a prohibition was sought and obtained proves two things: (a) That the admiralty court claimed, and (b) that the common-law court denied, the jurisdiction of the admiralty in the case supposed. The granting of a prohibition proves the claim quite as thoroughly as it proves the denial. Third. The decided cases exhibit a conflict between two courts and two systems of law; a conflict which lasted for several centuries, and in which the court of common law was the stronger, and finally prevailed, while yet the court of admiralty never admitted itself to be in the wrong. In the course of the struggle several compromises were proposed, and the result finally reached had the nature of a compromise, though the admiralty obtained very little of its original claim. The decisions, therefore, are not altogether consistent with each other. The jurisdiction of the admiralty in case of supplies furnished in a domestic port was denied in Leigh v. Burley (1610) Owen, 122, but in Tasker v. Gale (1634) 1 Rolle, Abr. 533, it was said that, if a shipwright sues in the admiral's court for the fittings of the ship for navigation at sea, no prohibition lies. This case has often been quoted to show that the courts of common law recognize the right to sue in the admiralty under the conditions stated. Yet nothing is plainer than that the courts of common law generally denied the right. The explanation of the statement in Tasker v. Gale is prob-

ably to be found in the fact that the case was decided only two years after the compromise resolutions of 1632 had been entered into, and while they were yet deemed to be in force. By these resolutions the jurisdiction of the admiralty was recognized in libels for building and for domestic supplies, and the decision in Tasker v. Gale followed the resolutions. Again, it was admitted that suit could be brought in the admiralty upon a hypothecation of the ship made at sea. The longest debate between the common law and the admiralty concerned the right to sue in the admiralty upon a hypothecation made in a foreign country on land. In Bridgeman's Case, Hob. 11, Id. (1615) Moore, 918, a prohibition was granted against a suit in the admiralty to hold a ship for money borrowed at Seville by the master. The prohibition seems to have issued because the money was borrowed on land, and so the suit was deemed to be beyond the admiralty jurisdiction, inasmuch as that jurisdiction was limited by the statute of Richard II to matters arising upon the high seas. "The admiralty court hath no power over any case at land, for both by the nature of the court and by the statute it is only to meddle with things arising upon the high seas." It is true that in the opinion mention was also made of the right of the master to pledge the ship in case of necessity, but the chief justice recognized that the decision went altogether upon the want of jurisdiction of the admiralty court, and not upon substantive admiralty law. He said, "I am of opinion clearly that, if this case had been within the jurisdiction of the admiralty, that we should not prohibit them because they gave sentence against our law in this point of impawning, for it shall be presumed according to their law, or else to appeal." See Jenkins' Life, I, 83. So, in Cradock's Case (1610) 2 Brownl. & G. 37, "it was cited to be adjudged that, if a contract be made at Roan, in France, that shall not be tryed in the admiral court, for that it was made upon the land, and not upon the sea." See Johnson v. Shippen, 2 Ld. Raym. 982; Thomlinson's Case, 12 Coke, 104. In Cossart v. Lawdley (1688) 3 Mod. 244, a prohibition was issued in case of a hypothecation, and a suit was ordered to be brought at common law upon the necessity of borrowing; but, when a suit was brought against the original libelant under the statute of Richard II, Chief Justice Holt seems to have decided for the defendant, saying that there was no color for the prohibition, as the matter was triable only in the admiralty court, though the hypothecation was in a foreign land. Corset v. Husely, Comb. 135, Holt, 48. This construction of the statute of Richard II, which permitted the admiralty to take jurisdiction of a suit against a ship upon a bottomry bond made abroad and on land, became the established law. See Lister v. Baxter (1726) 2 Strange, 695; Watkinson v. Bernardiston (1726) 2 P. Wms. 367. That the right to sue in the admiralty for advances, repairs, and supplies depended altogether upon the territorial jurisdiction of the admiralty, and not upon substantive admiralty law, is further illustrated by Godfrey's Case, Latch. 11 (Temp. Jac. I), where it is said that, if the ship lies at anchor, wanting victuals, and sends to J. S. to bring victuals, then the contract is made on the ship, therefore upon the sea, and so the matter is triable in admiralty; otherwise if the contract is made on land, and the victuals are afterwards sent to the ship. Here the ownership and situation of

the vessel, the nature of the supplies, the necessity of victuals, and all concomitant acts are precisely the same, yet the right to libel the ship is made to depend wholly upon the technical locus contractus. See Thomlinson's Case (1605) 12 Rep. 104; Cradock's Case (1610) 2 Brownl. & G. 37. The case of Tucker v. Cappes (1625) 2 Rolle, 492, 497, illustrates the confusion into which the courts of common law sometimes fell concerning matters of admiralty and foreign law. The question did not concern a lien, but apparently a suit for demurrage. One judge observed incidentally, referring to the colony of Virginia, that the admiral's court has jurisdiction of acts done in all countries except England, because all other countries are ·governed by the civil law. See Delabroche v. Barney (1589) 3 Leon. 232; Ball· v. Trelawny (1641) Cro. Car. 603. In Watson v. Warner (1659) 2 Sid. 161, it was stated that by the rules a person could be attached in the admiralty as well as the ship. In that case the court was governed by the statute of the commonwealth above referred to, and some rules may have been made thereunder of which no record can now be found; otherwise it would seem that the reporter must have misunderstood the case. In Smith v. Tilly (1665) 1 Keb. 708, after the restoration, and at a time when the statutes of the commonwealth were not in force, the court was divided concerning the granting of a prohibition in the matter of a libel against a ship for provisions and wages, "which hath been in these cases so constantly used, but in other cases it's against the parties. But per cur. this is but a device, and the parties may come in and be admitted pro interesse, as if the original process were against them. 1 Cr. 296 (the resolutions of 1632) is an anomalous collection, and by this course, if the butcher or baker sue or be sued for meat sold to the master, it should be in the admiralty, which would be inconvenient. But there not appearing any rule for prohib. adj." Page 712: "The court were divided Hyde & Wyndham against Twisden & Keeling, that this libel against a ship for provisions is as good as for mariners' wages; but by Keeling this is but by sufferance, because they are poor men and going to sea. Also Wyndham doubted that a ship may be pawned in England, but by Keeling clearly it cannot be pawned in England, but only by distress beyond sea." The case shows that the want of jurisdiction in the admiralty over a libel for domestic supplies was not yet completely settled. The resolutions of 1575 and 1632 and the statutes of the commonwealth had somewhat affected legal opinion. Moreover, the common-law judges, or at least their reporters, began to confound the question of jurisdiction with that of substantive law. In Coomes v. Jenkinson (1675) 3 Keb. 398, the jurisdiction of the admiralty under the conditions supposed was denied, and prior statements to the contrary were declared to be "exploded opinions." See Merryweather v. Mountford (1676) 3 Keb. 552; Hoare v. Clement (1684) 2 Show. 338, which cases show that the admiralty still claimed jurisdiction. That the right to sue in the admiralty depended, not upon substantive law, but upon the place where the contract was made, is still further illustrated by cases in which a foreign ship was repaired in England. Here the necessity of repair, the absence of the owner, and other circumstances were the same as those attending the repairs of an English ship abroad. Yet the court

of admiralty was deemed to be without jurisdiction. Thus, in Justin v. Ballam (1702) 1 Salk. 34, a foreign ship in distress purchased supplies at Ratcliffe upon the Thames. The ship was libeled in the admiralty, and in arguing the question of prohibition counsel for the libelant relied upon a case which sustained the jurisdiction of the court over a libel against an English ship hypothecated in Holland. The court of king's bench observed:

"By the maritime law the contract of the master implies an hypothecation, but by the common law it is not so, unless it be so expressly agreed. In the Case of Coster there was an express hypothecation, and that was in a place where hypothecations were allowed good. For that reason we allowed the jurisdiction of the admiralty in that case, for there was no remedy at common law; but in this case there is nothing but a mere common contract at land."

A prohibition was therefore issued. See Benzen v. Jeffries (1697) 1 Ld. Raym. 152. The Henrich Bjorn, 11 App. Cas. 270, 282. In defending the jurisdiction of the court of admiralty, Zouch observes:

"Some amongst us as take upon themselves to determine that to the jurisdiction of the admiralty of England no special or certain causes do belong. So the Lord Hobard in Audley and Jenning's Case affirmes that their jurisdiction is not in respect of any certain cases, as the causes of Tithes and Testaments are in the Spiritual Courts, but only in respect of place; and no doubt but Sir Edward Cook and others, who talk so much of altum mare, are themselves perswaded and would perswade others to be of that opinion." Zouch, Adm. p. 28.

The language of the common-law courts, indeed, does not always distinguish between matters of jurisdiction and of substantive law. Thus Lord Mansfield said:

"Work done for a ship in England is supposed to be on the personal credit of the employer. In foreign parts the captain may hypothecate the ship." Wilkins v. Carmichael, 1 Doug. 101.

And Lord Hardwicke said:

"If at sea, where no treaty or contract can be made with the owner, the master employs any person to do work on the ship, or to new rig or repair the same, this, for necessity and encouragement of trade, is a lien upon the ship, and in such case the master, by the maritime law, is allowed to hypothecate the ship." 2 P. Wms. 367. See Ex parte Shank, 1 Atk. 234.

Very likely Lord Hardwicke meant no more by this expression than to say that the master abroad might hypothecate the vessel by bottomry. With all respect for these great judges, it must be said frankly that their dicta, if taken literally, represent neither the old admiralty law of England nor the common law, but merely the resultant of the two as worked out through a conflict of territorial jurisdiction. The admiralty law gave a lien upon the ship whether the work was done in England or not. The common law gave no lien upon the ship whether the work was done in England or not. See Buxton v. Snee, 1 Ves. Sr. 154; Menetone v. Gibbons, 3 Term R. 267. By the courts of common law, as has been said, the court of admiralty was at last allowed jurisdiction of a suit on bottomry bond made in the course of a voyage, whether executed on land or at sea. Lord Kenyon observed that the practice had been settled since the days of Lord Raymond. "Then, if the admiralty has jurisdiction over the subject-matter, to say that it is necessary for the parties to go upon the sea to execute the in-

strument borders upon absurdity." Id. 269. Mr. Justice Buller further observed, "The question whether the court of admiralty has or has not jurisdiction depends on the subject-matter." Id. These statements just quoted illustrate the confusion, before referred to, of jurisdiction and substantive law, and they directly contradict the statute of Richard II, and the well understood and established practice of the courts of common law in preceding centuries. The jurisdiction of the English court of admiralty, as declared by the courts of common law, depended generally, as Zouch says, not upon the subject-matter, but upon the locality. The jurisdiction of the admiralty over bottomry bonds made in a foreign land was an exception introduced for convenience, like that which admitted suits for seamen's wages. From early times, indeed, the courts of common law permitted seamen to sue in the admiralty. Later they decided that a master could not sue there, though the court of admiralty was ready to take jurisdiction. The distinction depended, not upon any difference in the substantive law of the admiralty, but merely upon the fact that the courts of common law had, as a matter of convenience and mercy (Abb. Shipp. [7th Am. Ed.] 820, 830; Ewer v. Jones, 6 Mod. 25; The Mariners' Case, 8 Mod. 379), permitted the jurisdiction of the court of admiralty in one case, while denying it in the other. The court of admiralty then was permitted by the courts of common law to exercise (1) jurisdiction of matters arising upon the high seas (this jurisdiction never having been denied), and (2) jurisdiction of suits for seamen's wages and of suits upon bottomry bonds made in foreign countries (this jurisdiction being exceptional and allowed only for the sake of convenience). Further exceptions must be created by statute. Saving for manifest exceptions, the jurisdiction was made to depend, not upon subject-matter, but upon locality.

After the attempt had failed to get relief in the admiralty, and to hold the ship itself for repairs and supplies, the materialmen had to resort to courts of common law, and there to bring suit against the owners. The right of a materialman to sue the owner on a contract entered into by the master depended upon the law of agency. If the master, as agent, had authority to bind his principal, and in making the contract acted within the scope of his authority, the owner was bound; not otherwise. Maritime law and custom were properly resorted to in order to determine the scope of the master's authority. "Eyre, J., held there was no difference between a land carrier and a water carrier, and that the master of a ship was no more than a servant to the owners in the eye of the law, and that the power he has of hypothecation, etc., is by the civil law." Boson v. Sandford, 2 Salk. 440. At first it seems that the authority of the master was presumed. "It was held that prima facie the repairer of a ship has his election to sue the master who employs him or the owners, but, if he undertakes it on a special promise from either, the other is discharged." Garnham v. Bennett, 2 Strange, 816. Later it was said that, if the owner was absent, the master could bind him, but, if he was present, the contract bound only the master. "Under the general authority which the master of a ship has, he may make contracts and do all things necessary for the due and proper

prosecution of the voyage in which the ship is engaged. But this authority does not usually extend to cases where the owner can himself personally interfere, as in the home port, or in a port in which he has beforehand appointed an agent who can personally interfere to do the thing required. Therefore, if the owner or his general agent be at the port, or so near it as to be reasonably expected to interfere personally, the master cannot, unless specially authorized, or unless there be some usual custom of trade warranting it, pledge the owner's credit at all, but must leave it to him or to his agent to do what is necessary. But, if the vessel be in a foreign port, where the owner has no agent, or if in an English port, but at a distance from the owner's residence, and provisions and other things require to be provided promptly, then the occasion authorizes the master to pledge the credit of the owner." Arthur v. Barton, 6 Mees. & W. 138, 143. And, if the port of repairs was not far distant from the owner's port, the jury was to determine if the supplies were obtained for the necessary use of the vessel upon credit given to the owner; i. e., if the master, in pledging the owner's credit, was acting within the scope of his agency. The nearness of the owner was an element in determining if the purchase of supplies without consulting him was reasonably necessary. In other words, the presence or absence of the owner was a circumstance bearing upon the authority of the master to bind him. See Edwards v. Havill, 14 C. B. 107; Robinson v. Lyall, 7 Price, 592; Beldon v. Campbell, 6 Exch. 886; Johns v. Simons, 2 Q. B. 425; Webster v. Seekamp, 4 Barn. & Ald. 352; Cary v. White, 5 Brown, Parl. Cas. 325.

The liability of the owner of a vessel in contract for the acts of his authorized agent is a thing quite different from a lien arising from the act of repairing or of supplying. This appears from the cases in which the legal owner of a vessel was held not liable for the acts of the master duly appointed, upon the ground that, notwithstanding the legal ownership, the master was not his agent. Thus, where the vessel was under a charter which provided that the charterer should repair, the owner was held not bound, though the materialman knew nothing of the charter. Reeve v. Davis, 1 Adol. & E. 312; Frazer v. Marsh, 13 East, 238. Although these cases have no direct bearing upon the lien of the materialman, yet in the diminished state of the English admiralty jurisdiction, which prevented an action directly against the vessel, the lien and the owner's liability were confused. Thus, in Rich v. Coe, 2 Cowp. 636, 639, Lord Mansfield said: "Whoever supplies a ship with necessaries, has a treble security: (1) The person of the master; (2) the specific ship; (3) the personal security of the owners, whether they know of the supply or not." And see Farmer v. Davies, 1 Term R. 108; Reeve v. Davis, 1 Adol. & E. 312. It is possible that the theory of a right to proceed against the ship was connected with the theory, sometimes discussed, that the master, though the agent of the owners, could not bind them beyond the value of the ship. See Yates v. Hall, 1 Term R. 73, especially the opinion of Mr. Justice Buller. Probably the latter theory arose from a confusion between the general maritime law and the common law of agency. Certainly it is foreign in the latter, and it leads

naturally to a right of some sort to proceed against the ship. The authority of Lord Mansfield's great name, and the confusion just noted, caused his dictum in Rich v. Coe, notwithstanding its incorrectness, and its contradiction of his own statement in Wilkins v. Carmichael to be questioned at first, rather than denied. Westerdell. v. Dale, 7 Term R. 306; Jackson v. Vernon, 1 H. Bl. 114. See, also, The Ship Enterprise, Hopk. Judgm. 171. It has been shown that this dictum was, as to proposition 2, in complete contradiction to the law of England as laid down in all cases except in those in which the court of admiralty successfully evaded the prohibitions of the courts of common law. It is to be noticed that even Lord Mansfield made no distinction between foreign and domestic vessels, and that the vessel of which he happened to be speaking was almost certainly domestic. It will hereafter appear that the decisions in the suits against the owner just referred to were sometimes misapplied by American courts in the discussion of suits against the vessel.

The history of the law of Scotland appears best from the briefs submitted to the House of Lords in Wood v. Hamilton, 3 Paton, 148, cited in Maclachlan, Merch. Shipp. (3d Ed.) 68; "Appeal Cases in the House of Lords (1786–1789)" at end of volume, in Social Law Library. The brief for the appellants in support of the lien for domestic repairs is signed by T. Erskine (Lord Erskine) and W. Grant (Sir William Grant); that for the respondents by Ilay Campbell (afterwards lord president of the court of session) and Alexander Wight. The proceeding was to establish a lien upon a vessel for repairs furnished in her home port. The lord ordinary sustained the lien. On appeal the court of session sought the opinion of English counsel upon the law and practice of England (for what reason does not appear). The English counsel replied that a materialman had no lien, founding his opinion entirely upon cases in the common-law courts. The court of session reversed the decision of the lord ordinary. Upon a first rehearing, sought by the counsel for the materialmen, the court of session reversed its first decision, and affirmed that of the lord ordinary. Upon a second rehearing the same court went back to its first decision, and reversed the lord ordinary. Upon a third rehearing the court adhered to its disallowance of the lien. Mor. Dec. 6269. The elaborate arguments of counsel on both sides are interesting. It was made to appear that the admiralty court of Scotland had long entertained jurisdiction of suits against a ship for repairs and supplies both foreign and domestic. Many unreported cases in the court of admiralty were produced to establish this fact. The practice had been sustained by the court of session in Watson v. Arbuckle (1711) Mor. Dec. 6262, and in Rope-Work Co. v. Crosses (1761) Id. 6268. Otherwise where the ship had not been launched. Maxwell v. Wardroper, Id. 6266. This appears to have been the common understanding. To meet this argument, the respondents were driven to urge "that the practice of the admiralty court in the matter appeared to have been a series of errors from first to last." There was some discussion regarding the continental law. The appellants asserted, as was quite true, that it generally gave a lien or right to proceed against the ship for domestic as well as for foreign

repairs. This was somewhat disputed by the appellees, in spite of the appellants' reference to the Ordonnance de la Marine. The house of lords confirmed the interlocutor of the court of session. There can be little doubt that the final decision was based largely upon a wish to harmonize the English and Scotch law upon the subject. See Currie v. McKnight [1897] App. Cas. 97. It was the first case that has been discovered in which, without written instrument, a vessel was held not bound for domestic repairs when it would admittedly have been bound for foreign repairs. The English law was still very different from the Scotch, for in England no lien (save by express hypothecation) was recognized for repairs, either foreign or domestic.

It has hitherto been shown that at the time of the American Revolution the English court of admiralty was permitted to exercise jurisdiction in favor of the materialman only in two cases: (1) Where there was a bottomry bond executed at sea or abroad (see The Atlas, 2 Hagg. Adm. 49); and (2) where the ship had been sold for some reason otherwise sufficient, and the proceeds were in the registry of the admiralty, in which case the materialman was for a time allowed to assert a lien on the proceeds, whether the materials were furnished in a home or in a foreign port. See Waring v. Clarke, 5 How. 441, 452, 12 L. Ed. 226. No distinction between foreign and domestic repairs was recognized until 1835. This limitation upon the admiralty jurisdiction resulted, not from any interpretation of the general maritime law by the court of admiralty, but merely from the prohibitions issued by the courts of common law, which restrained the court of admiralty from exercising in any other cases that general jurisdiction which the admiralty had claimed long and vigorously. The admiralty court claimed jurisdiction of all actions in rem (and originally of actions in personam as well) in all cases where supplies had been furnished a vessel, either in a home or in a foreign port, both where there was an express hypothecation by bottomry or otherwise and where there was no express hypothecation whatsoever. If, for example, a party brought suit in the admiralty court against a vessel for supplies furnished in the home port, the court gave him a remedy in theory, and probably in practice, unless and until it was prohibited from proceeding further by a court of common law. See The General Burnside (C. C.) 3 Fed. 228. In the seventeenth century the remedy was often effective. The jurisdiction which the English admiralty court exercised somewhat furtively, and vainly claimed where it was denied, the Scotch admiralty court then exercised fully. But after the decision of Wood v. Hamilton the substantive admiralty law of Scotland was declared to be different from the substantive admiralty law of England, though the available remedies of the materialman in the two countries were much the same. In England the domestic materialman had on his side the substantive admiralty law, but failed by the defective jurisdiction of the admiralty court. In Scotland the court was left with sufficient jurisdiction, but the substantive law was changed by Wood v. Hamilton.

From the admiralty courts of Great Britain we pass to those of the American colonies. It has been supposed that these exercised a ju-

risdiction much more extended than those of the mother country. Thus, in De Lovio v. Boit, 2 Gall. 398, 470, Fed. Cas. No. 3,776, Mr. Justice Story says that:

"The commissions of the crown gave the [colonial admiralty] courts which were established a most ample jurisdiction over all maritime contracts, and over torts and injuries, as well in ports as upon the high seas. And acts of parliament enlarged, or rather recognized, this jurisdiction by giving or confirming cognizance of all seizures for contraventions of the revenue laws. Tested, therefore, by this exposition, the admiralty jurisdiction of the United States would be as large as its most strenuous advocates ever contended for."

In support of this proposition, Mr. Justice Story cited the form of commission used in New Hampshire in 1731. See Waring v. Clarke, 5 How. 441, 454, 12 L. Ed. 226. But it must be remembered that neither the crown nor the courts of admiralty acquiesced in the construction given to those statutes by virtue of which the English courts of common law prohibited most of the admiralty jurisdiction. The fact that a royal charter reserved admiralty rights, or that a royal commission purported to give them, does not prove that those rights were exercised freely, and acquiesced in by the courts of common law. Thus Mr. Justice Woodbury said in his dissenting opinion in Waring v. Clarke, 5 How. 441, 477, 12 L. Ed. 226:

"These commissions, in the largest view, only indicated what might be done, not what was actually afterwards done under them. In the next place, all must see, on reflection, that a commission issued by the king could not repeal or alter the established laws of the land." "But besides these conflicting features in different parts of them, the commissions of vice admirals here seem, in most respects, copies of mere forms of ancient date in England."

See New Jersey Steam Nav. Co. v. Merchants' Bank of Boston, 6 How. 344, 422, 12 L. Ed. 465; The Apollo, 1 Hagg. Adm. 306, 312.

The decision in Waring v. Clarke is now the long-settled and thoroughly established law of the United States, and the dissenting objection of Mr. Justice Woodbury is quite unavailing, but his historical criticism of the scanty basis of Judge Story's argument is not shaken. Mr. Justice Woodbury went on to observe on page 479, 5 How., and page 226, 12 L. Ed.:

"In connection with this, all the admiralty reports we have of cases before the Revolution, and of cases between 1776 and 1789, seem to corroborate the same view, and are worth more to show the actual jurisdiction here than hundreds of old commissions containing obsolete powers never enforced. There is a manuscript volume of Auchmuty's decisions made in the vice admiralty court of Massachusetts about 1740. See Curt. Merch. Seam. 348, note. It will be difficult to find in them, even in one colony, much more in the thirteen, clear evidence of any change here, before the Revolution, in respect to the law concerning the locality of torts."

But here it must be observed, upon the other side, that the basis of Judge Woodbury's statement is itself somewhat narrow. There are several manuscript volumes, instead of the one he referred to, and they cover a large part of the proceedings of the vice admiralty court of Massachusetts between 1716 and 1776. Regarding the jurisdiction actually exercised they sustain pretty completely Judge Story's contention, though it seems he never read them. See Insurance Co. v. Dunham, 11 Wall. 10, 20 L. Ed. 90; 21 Wall. 601, 22

L. Ed. 654. They contain libels in personam for the wages of the master, and libels in rem for his wages and his disbursements (Fletcher v. La Taile, vol. I, p. 17; Allen v. Johonnot, I, 26; Pulsifer v. Walley, I, 48; Stanley v. The Adventure, I, 105; Hodskins v. Sloop Argyle, I, 114); libels in personam for freight due under a charter party; libels in rem for the survey and sale of a vessel cast away on the coast of Massachusetts (one of these cases is printed by Mr. Curtis at page 378,—Oliver, Petitioner); a libel in personam for failure to prosecute a voyage, brought by the owner of the cargo (Fitch v. Tudor, I, 39); libels in rem for supplies furnished a vessel, the vessel probably being foreign, and the claim being really upon the proceeds, rather than upon the vessel itself, no bottomry being alleged (Hill v. Ship Elizabeth, I, 43 et seq.; Winthrop v. Sloop Africa, I, 132). These cases are directly opposed to Justin v. Ballam. There are many possessory cases: A libel in personam for failure to deliver up the effects of a passenger (Conner v. Manachy, I, 51); a libel in personam for freight (Logan v. Bodkin, I, 59); a libel in personam for expenses in fitting out the vessel (Pemberton v. Goffe, I, 63); libels in personam, for damage done by improper stowage (Franklin v. Browne, I, 66); libels by part owners of vessels to compel other part owners to agree to a voyage or to fit out the vessel, the decree sought being an enforced sale or purchase by a dissenting owner (Nelson v. James, I, 102; see Dimmock v. Chandler, Fitzg. 197); a libel in rem for rigging and other supplies (Winthrop v. The Africa, I, 132); libels in rem for wharfage and advances (Gallop v. The Willing Mind, I, 180; Gerrish v. Ship Sarah, I, 123); a libel in rem by the builder of the vessel for a part of its price (Alfrey v. Snow Charming Molly, II, 86); libels in rem for work done on a vessel (Wakefield v. Cloud, II, 96; Gibbs v. The Christiana, II, 110). The records of the vice admiralty court of the province of Rhode Island are to the same effect. In Moffatt v. The Mermaid, formerly called The Peggy, decided December 14, 1752, a proceeding to compel a co-owner either to pay his share of the cost of fitting out the vessel, or to sell the share at an appraised value, the case was heard against an objection to the jurisdiction. See Averill v. Blackstock, 1750; Belknap v. Freeman, 1752. Freeman v. Craine, 1747, and Chadwick v. Clark, 1751, were suits in personam for pilotage. Oliver v. The Industry, 1744, was a suit by the master for wages and advances, combined with a suit by the crew for wages. These cases give considerable support to the argument of Mr. Justice Story, and meet pretty completely that of Mr. Justice Woodbury; but there are other considerations which must yet be weighed. These cases show what the court of admiralty believed itself competent to do, but not improbably the contemporary records of the English admiralty court would show a somewhat similar state of affairs. In many or most of the cases above cited the parties respondent may have admitted the jurisdiction; that is to say, they may have failed to seek writs of prohibition. There is ample evidence that the courts of common law in the provinces of Massachusetts and Rhode Island were issuing at the same time prohibitions to the court of admiralty. To determine precisely the rules which governed the issu-

ance of these writs would require a more thorough investigation of the records of the provincial courts of common law than I have had time to make. See Scollay v. Dunn, Quincy, 74; Bardin v. Lambert, Rec. (1730–1733) 135; Patten v. Stacy, Id. (1716) p. 143; Shaw v. Bethune, Id. (1725–1730) 182; Perkins v. Wylie, Id. 338. The case of Potter v. The Brigantine Greyhound, decided by the vice admiralty court of Rhode Island in 1747, was a libel in rem for cash advances, labor performed, and necessaries furnished in Newport on the order of the owners of the vessel. It seems that the owners resided at Bristol. The vessel was arrested, and the owners pleaded to the jurisdiction. The plea (so styled) was overruled. The owners obtained a writ of prohibition. After several adjournments, the admiralty court still proceeded with the case, probably because the proceedings in prohibition had been dropped on account of an agreement to refer to arbitration. This agreement failing, the libelant proceeded in admiralty, and was permitted to do so in spite of the claimant's objections. A second prohibition followed, and the admiralty proceedings were ended by an agreement for a retraxit. This case illustrates the jurisdiction over maritime liens which the vice admiralty court sought to exercise, and it shows also that an assumption of jurisdiction by a court of admiralty is not the same thing as a recognition of that jurisdiction by the more potent court of common law. The most that can be said of the colonial admiralty records is this: They show (1) that these courts exercised the jurisdiction which the English court of admiralty claimed, and which that court may have exercised, in many cases; (2) that this exercise of jurisdiction was not altogether acquiesced in by the courts of common law; but (3) that, as a result, the colonial admiralty courts probably did exercise in fact a somewhat broader jurisdiction than did the corresponding English court, though there was between the two no admitted difference of law. By virtue of an act of parliament it seems that the colonial courts of admiralty exercised in some matters connected with the customs a jurisdiction denied to the English court of admiralty (see U. S. v. Bevans, 3 Wheat. 336, 383, 4 L. Ed. 404); but no act of parliament, so far as known, extended their jurisdiction over maritime liens. The act of 15 Rich. II, c. 3, was taken to be the law of the land in Massachusetts and in Rhode Island, as in England, and there is no evidence that the colonial courts of common law, when appealed to, gave to it a construction less extended than did similar courts of England. See, also, Brayton v. Almy, decided by the Rhode Island superior court of judicature March 22, 1733. The prohibition then asked for was denied, indeed, but the statute of Richard II seems to have been recognized as having full application. See Waring v. Clarke, 5 How. 441, 461, 12 L. Ed. 226; Freeman v. Belknap, R. I. Super. Ct. Jud. March, 1754.

Between the Declaration of Independence and the adoption of the federal constitution there exist two or three reported cases. In Clinton v. The Hannah (1781) Bee, 419, Fed. Cas. No. 2,898, the court, in dealing with the alleged lien of a shipwright for building a vessel, recognized the English rule, and followed professedly the decisions of the English courts of common law. In Shrewsbury v.

The Two Friends, Bee, 433, Fed. Cas. No. 12,819, decided in 1786, Judge Drayton said:

"And herein I distinguish thus: Where a vessel is lying in port, and the owner is there present, all matters and contracts relative to her must be supposed to be entered into by him on shore, and consequently to be infra corpus comitatus; and redress and satisfaction in case of any dispute on the occasion must be sought in the courts of common law. But where a vessel is on a voyage, and by stress of weather or other accident puts into a port, the occasion happening at sea, and on her arrival in port no owner being present to whose personal credit recourse may be had for necessaries, the master, ex necessitate rei, has a right to procure them on the security of the vessel; and to obtain payment on that security that is the proper and only court to apply to. This distinction is plainly laid down and taken notice of in all the cases where this matter has been agitated."

The learned judge quoted in support of his argument almost altogether from cases in the English courts of common law. It seems that he believed that the reason why a libel in rem could be maintained in the admiralty for supplies furnished a vessel in a foreign port was that the jurisdiction of the court of admiralty attached to a contract for supplies there made, while such a suit could not be maintained for domestic supplies, because the jurisdiction of the court of admiralty did not attach to a contract made in a domestic port. He did not suppose that the substantive law of the admiralty gave a lien in one case more than in the other. He believed himself to be following, not the general maritime law, but the limitations imposed upon the admiralty jurisdiction by the English courts of common law. He therefore refused to permit the domestic ship carpenter to recover. His reasoning, indeed, might perhaps have permitted a recovery for supplies furnished in a foreign port, even where no bottomry bond had been given. If he would really have permitted this, he was prepared to go further than the English admiralty courts had been allowed to go, but at the most this conclusion of his was a doubtful obiter dictum. His language, like that of contemporary English courts, shows the beginning of that confusion between jurisdiction and substantive law which has so much affected the later history of the lien.

When the federal district courts were established as courts of admiralty, they found their situation greatly different from that of all previous admiralty courts in countries governed by the common law. (Some colonial courts had both admiralty and common-law jurisdiction, and some state courts had admiralty jurisdiction between 1776 and 1789, but the exceptions are insignificant.) See The Lottawanna, 21 Wall. 559, 580, 22 L. Ed. 654. Thereafter prohibitions became rare, though still permitted by statute. See Rev. St. § 688 [U. S. Comp. St. 1901, p. 565]; Ex parte Gordon, 104 U. S. 515, 26 L. Ed. 814; In re Fassett, 142 U. S. 479, 12 Sup. Ct. 295, 35 L. Ed. 1087; Ex parte Phenix Ins. Co., 118 U. S. 610, 7 Sup. Ct. 25, 30 L. Ed. 274. The court which could prohibit and the court of appeal were the same. The same court of admiralty determined the jurisdiction and applied the substantive law. True, there was an appeal both as to jurisdiction and substantive law, but the appeal

was to a higher court of admiralty. On the other hand, the federal judges who sat in admiralty were no mere civilians. They were generally common lawyers, who, then as now, added to their legal store such knowledge of civil and general maritime law as their duties. gave them time to acquire. Their acquaintance with the civil law, not their ignorance of it, is surprising; but their fundamental training had its results. In·North v. The Eagle, Bee, 78, Fed. Cas. No. 10,309, decided in 1795, Judge Bee, the successor of Judge Drayton, sustained a libel for supplies furnished in a foreign port. The decision was rested upon the erroneous dictum of Lord Mansfield in Rich v. Coe, 2 Cowp. 636, 639, above quoted. That dictum suggested no difference between a domestic and a foreign port. Notwithstanding its unsafe foundation, the decision in North v. The Eagle is authority that a suit in rem can be maintained against a vessel without hypothecation. The suggestion that this remedy was limited to the case of supplies furnished in a foreign port was not reasoned out, and was apparently made to depend upon the limits of the admiralty jurisdiction, and not upon the substance of the admiralty law. In Boreal v. The Golden Rose, Bee, 131, Fed. Cas. No. 1,658, decided in 1798, a merchant who had supplied a captain with money in a foreign port brought suit against the vessel. The learned judge began his opinion by stating that all the cases quoted as bearing upon the question "were determined in courts of common law, but upon the principles of the civil law,"—a statement so unintelligible as to raise a doubt if the printer did not play him false. He next referred to the dictum in Rich v. Coe, above cited, without noticing that no distinction was there made between foreign and domestic repairs, and then said that there was no lien unless with 'possession or by "hypothecation duly made,"—a statement in flat contradiction to Lord Mansfield's dictum. As the learned judge found that the vessel had not been "hypothecated by deed or implication" he dismissed the libel. Notwithstanding his suggestion of an implied hypothecation, he seems to have treated the case mainly as one of bottomry. This appears further from his reference to The Emperor, Hopk. Judgm. 163, 170. In Pritchard v. The Lady Horatio, Bee, 167, Fed. Cas. No. 11,438, decided in 1800, the same judge dismissed for want of jurisdiction a libel brought against a foreign vessel for repairs, and in his opinion seems to have somewhat confused a want of jurisdiction, the presence of an agent of the owner, the fact that the vessel was unladen, and that no necessity for giving credit existed. See O'Hara v. The Mary, Bee, 100, Fed. Cas. No. 10,467. These cases show that the confusion then existing in the minds of some English common-law judges was reflected in the minds of American judges who had been called from the study and practice of common law to sit in a court of admiralty. In Woodruff v. The Levi Dearborn, Fed. Cas. No. 17,987, decided in the district court of Georgia in 1811, a libel in rem was dismissed for want of jurisdiction where the materials had been furnished at the instance of the owner of a vessel which was not then upon a voyage. The contract was treated as outside the jurisdiction of the admiralty, the judge professedly following the case of Shrewsbury v. Two Friends. In the same case on appeal,

Fed. Cas. No. 17,988, Mr. Justice Johnson affirmed the judgment of the court below, and said:

"The argument in support of this libel has proceeded on the ground that the admiralty law of the United States is the civil law of the Roman government. But the civil law has undergone many changes and modifications, which we are not bound to trace. The admiralty law of Great Britain is the admiralty law here. The lien on vessels for materialmen and shipwrights exists only in a foreign port. Where the owner is present and resident, the common-law principle must govern. In such case no lien on the vessel is created. In the case of an owner, who, though present, when the work and materials are furnished, is transient and nonresident, I am disposed to think otherwise, and that in such case the lien attaches."

Doubtless the learned judge thus extended by implication the jurisdiction of the admiralty court beyond that permitted in England, though he did not perceive that he had done so. Also he appears somewhat to have lost sight of the difference between jurisdiction and substantive law. He speaks of the "common-law principle" governing in one case and not in another. Probably, however, he meant no more than that the admiralty court had jurisdiction in one case and had no jurisdiction in the other. These decisions and their language tended, however, to bring about the further confusion which will presently appear. In Gardner v. The New Jersey, 1 Pet. Adm. 223, Fed. Cas. No. 5,233, the court took jurisdiction of a libel in rem by a master for supplies, saying:

"Claims of materialmen for supplies afforded to a ship are within the jurisdiction of the admiralty, and suable there, in England, as well as in other states. Pilotage is a necessary expenditure on a voyage. If a master pays demands for these claims, he represents the claimants, and the lien continues on the moneys produced by the sale of the ship. As to pilotage, the master is bound by the Laws of Oleron, and other maritime laws, to pay it, for the safety of the ship and goods. In England a shipwright may sue in the admiralty for building a ship for navigation on the sea, and for repairing a ship."

The last remark shows the danger of relying upon two or three cases only, where the mass of reported decisions is great, and especially where the reports are early and imperfect. If there was a point of law then well settled in England, that point was the want of jurisdiction in a court of admiralty over a libel by a shipwright to recover for his services in building a vessel. Throughout his opinion in Gardner v. The New Jersey the learned judge plainly believed himself to be regarding the limits of English admiralty jurisdiction, however mistaken his notions of those limits may have been. On the other hand, in Stevens v. The Sandwich, 1 Pet. Adm. 233, Fed. Cas. No. 13,-409, decided in 1801 in the district court of Maryland, Judge Winchester held that the courts of admiralty created by the constitution were not limited in their jurisdiction by the prohibitions issued by the English courts of common law, and that they could take cognizance of contracts and debts for building and repairing ships. He therefore sustained a libel in rem for repairs, apparently made in the home port. This was the first, and for some time the only, reported case, which suggested that the jurisdiction of the American admiralty courts was different from that of the English. According to the late Judge John Lowell, the unreported practice of the admiralty court in this district agreed with Stevens v. The Sandwich. See The George

T. Kemp, 2 Low. 477, 481, Fed. Cas. No. 5,341. This practice may have arisen from the broad jurisdiction assumed by the colonial court of vice admiralty in Massachusetts. In The Jerusalem, 2 Gall. 345, 348, Fed. Cas. No. 7,294, Mr. Justice Story said:

"The admiralty has always rightfully possessed jurisdiction over all maritime contracts; and the decisions of the courts of common law, prohibiting its exercise, are neither consistent in themselves nor reconcilable with principle." "It will be recollected that this is a foreign ship, and that by the general maritime law every contract of the master for repairs and supplies imports an hypothecation. It has been supposed that the rule of the common law is different. But it has never yet been extended to cases of repairs of foreign ships, or of ships in foreign ports. I hold, therefore, that the contract for repairs in this case, being of a foreign ship, is to be governed by the maritime law, and created a lien. Whether, in case of a domestic ship, materialmen have a lien for supplies and repairs furnished at the port where the owner resided, I give no opinion. There are great authorities on both sides of the question, though upon principle, independent of common-law authorities, it does not seem to me that there is much room for doubt. Be this as it may, it cannot affect the jurisdiction of the admiralty in such cases, for that stands altogether independent of the doctrine of liens, and may be enforced as well by process in personam as in rem." Pages 349, 350, 2 Gall., and Fed. Cas. No. 7,294.

From these quotations it will be seen that Mr. Justice Story, while undoubtedly accepting the general jurisdiction of the admiralty in case of maritime contracts, yet doubted whether a court of admiralty should apply the general maritime law or the common law to the case of domestic repairs. With all his great learning, he seems to have forgotten that no English admiralty court ordinarily applied the common law to any question before it, and that no English court of common law ever dreamed of making it do so. In other words, even he confused jurisdiction and substantive law, as it has been shown that other judges were doing elsewhere at about the same time. In De Lovio v. Boit, 2 Gall. 398, Fed. Cas. No. 3,776, decided in 1815 in an opinion which is now classic, Mr. Justice Story decided that the admiralty court had jurisdiction, concurrently with the courts of common law, over maritime contracts, and that the federal courts of admiralty were not confined by the English limitations. The law then stood thus: Several circuit and district courts had decided that the American admiralty jurisdiction was the same as the English, although, in determining that jurisdiction, they had sometimes failed to observe correctly what the English jurisdiction actually was, and so had taken jurisdiction of suits in rem against a vessel for supplies furnished in a foreign port without express hypothecation,—a matter of which the English court of admiralty was not permitted to take jurisdiction. Other circuit and district courts had held that the federal courts of admiralty had a jurisdiction similar to that which the English admiralty courts had claimed, and one district court had applied this jurisdiction to the case of domestic supplies, permitting therefor a libel in rem. For a long time the conflict was left unsettled by the supreme court. In The Charles Carter, 4 Cranch, 328, 2 L. Ed. 636, the court took jurisdiction without question of a libel on a bottomry bond given by the owner in the home port, though it denied that, under the circumstances of the case, a lien existed. This was an

extension, probably unrecognized, of the English admiralty jurisdiction. In Martin v. Hunter's Lessee, 1 Wheat. 304, 335, 4 L. Ed. 97, Chief Justice Marshall observed that "the admiralty jurisdiction embraces all questions of prize and salvage, in the correct adjudication of which foreign nations are deeply interested. It embraces also maritime torts, contracts, and offenses, in which the principles of the law and comity of nations often form an essential inquiry." Thus he implied that the constitution (article 3, § 2), by extending the judicial power of the United States to all cases of admiralty and maritime jurisdiction, and the judiciary act of 1789, by giving to the district court jurisdiction "of all civil causes of admiralty and maritime jurisdiction," conferred upon the district court a jurisdiction in admiralty more extensive than that allowed by the courts of common law to the English admiralty court. The constitution and the judiciary act were thus made to repeal or avoid the statute of Richard II. The dictum just quoted seems to have long passed unnoticed. See U. S. v. Bevans, 3 Wheat. 336, 388, 4 L. Ed. 404, and the arguments of counsel; U. S. v. Wiltberger, 5 Wheat. 76, 106, note, 113, 5 L. Ed. 37; Waring v. Clarke, 5 How. 441, 457, 464, 12 L. Ed. 226. In The Aurora, 1 Wheat. 96, 4 L. Ed. 45, the court refused to enforce by a libel in rem a foreign bottomry bond given without necessity, following in this matter the English courts, both regarding jurisdiction and substantive law. In The General Smith, 4 Wheat. 438, 4 L. Ed. 609, decided in 1819, the court dismissed for want of jurisdiction a libel in rem by a materialman for repairs to a domestic ship. So far as the decision went, it was in accord with the English common law, was opposed to the English admiralty law and to the admiralty law of the continent. It overruled the case of Stevens v. The Sandwich, and solved the doubt expressed by Mr. Justice Story in The Jerusalem. In a short opinion, however, he asserted two very important principles which have now become established as part of the substantive law of American admiralty. These principles may best be understood by quoting the whole of the opinion:

"No doubt is entertained by this court that the admiralty rightfully possesses a general jurisdiction in cases of materialmen; and, if this had been a suit in personam, there would not have been any hesitation in sustaining the jurisdiction of the district court. Where, however, the proceeding is in rem to enforce a specific lien, it is incumbent upon those who seek the aid of the court to establish the existence of such lien in the particular case. Where repairs have been made or necessaries have been furnished to a foreign ship, or to a ship in a port of the state to which she does not belong, the general maritime law, following the civil law, gives the party a lien on the ship itself for his security; and he may well maintain a suit in rem in the admiralty to enforce his right. But in respect to repairs and necessaries in the port of a state to which the ship belongs the case is governed altogether by the municipal law of that state, and no lien is implied, unless it is recognized by that law. Now, it has been long settled—whether originally upon the soundest principles it is now too late to inquire—that by the common law, which is the law of Maryland, materialmen and mechanics furnishing repairs to a domestic ship have no particular lien upon the ship itself for the recovery of their demands. A shipwright, indeed, who has taken a ship into his own possession to repair it, is not bound to part with the possession until he is paid for the repairs, any more than any other artificer.

But if he has once parted with the possession, or has worked upon it without taking possession, he is not deemed a privileged creditor having any claim upon the ship itself."

The learned judge, speaking for the supreme court, therefore asserted: First. That the court of admiralty possesses a general jurisdiction to enforce contracts for supplies and repairs. In asserting this he was in accord witth Judge Winchester and with the theory of the English admiralty courts; but he was opposed to the English courts of common law, and to the Southern admiralty courts, as is shown in the cases above referred to. Second. He asserted that, if the case at bar had been a libel in personam, the court would have had jurisdiction. In this he agreed with the most ancient claim of the English admiralty courts, though they had ceased contending for it long before they were forced to abandon their jurisdiction over libels in rem; and perhaps he agreed with Judge Winchester, though this is doubtful. He was opposed to the courts of common law, to the compromise which the admiralty court made with the common-law courts in 1632, and to the Southern admiralty decisions. Third. That there was no lien for repairs upon a domestic ship. Here he was opposed to the theory of the English admiralty courts, to the continental courts, to Judge Winchester, and, though his conclusion was that of the English courts of common law, yet the conclusion was reached by drawing a distinction diametrically opposed to that which the common-law courts had consented to draw in 1632. Judge Story asserted that a libel in personam could be maintained where a libel in rem could not be. Except from his own intimation in The Jerusalem, above referred to, no court or judge, so far as is known, had ever suggested this distinction, while not a few courts had suggested that precisely the opposite distinction was maintainable. Fourth. Judge Story asserted that the general maritime law, following the civil law, gave to the materialman a lien for necessaries furnished in a foreign port. The general maritime law, as has been shown, gave a lien or privilege whether the supplies were furnished in a foreign or in a domestic port, though the results of the lien were somewhat different in the two cases. In respect of domestic repairs, he asserted that the case was governed by the municipal law. It is hard to say how far this corresponds to the continental view of the subject, for on the continent there was little distinction between municipal and maritime law. His statement regarding the lien on a domestic vessel did represent the law in England to some extent, but with the important qualification that, if the municipal law there gave a lien,—and it did give one to a materialman retaining possession of the vessel,—then that lien was enforceable only in common-law courts, and not in the admiralty. Here again the learned judge seems not to have perceived clearly the difference between jurisdiction and substantive law. The decision in The General Smith has not been overruled, notwithstanding its partial opposition to the general system of maritime law, but some of the principles stated in the opinion of the learned judge were not established for a long time. See the criticism of Mr. Justice Story's opinion in the dissenting opinion of Mr. Justice Clifford in The Lottawanna, 21 Wall. 558, 593, 22 L. Ed. 654.

In The St. Jago de Cuba, 9 Wheat. 409, 6 L. Ed. 122, the claims of materialmen for supplies, unsupported by bottomry or other hypothecation, were enforced against the proceeds of a vessel condemned for violation of law, in preference to the claim of the government; and Mr. Justice Johnson, who, it will be observed, maintained both before and afterwards that the English admiralty limitations prevailed in this country, stated, in delivering the opinion of the court, at page 416, 9 Wheat., and page 122, 6 L. Ed.:

> "For these purposes the law maritime attaches the power of pledging or subjecting the vessel to materialmen to the office of shipmaster, and considers the owner as vesting him with those powers by the mere act of constituting him shipmaster. The necessities of commerce require that when remote from his owner he should be able to subject his owner's property to that liability without which it is reasonable to suppose he will not be able to pursue his owner's interests. But when the owner is present the reason ceases, and the contract is inferred to be with the owner himself, on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived."

The first two sentences just quoted do undoubtedly express the general maritime law, but the third sentence does not, unless its application is limited to bottomry. As has been shown, there is no doubt that the general admiralty law, both in England and on the continent, recognized and enforced against the ship the lien of a materialman for supplies furnished in a home port. Whatever was his error regarding the general maritime law, it is clear that Mr. Justice Johnson did not suppose that he was departing from English precedent. De Lovio v. Boit had then been decided for 10 years, but The Levi Dearborn had not been overruled by any actual decision of the supreme court. As has been said, the English common-law courts allowed the court of admiralty jurisdiction over foreign bottomry bonds, and, even in the absence of bottomry, they for some time allowed the admiralty to satisfy the claims of materialmen, where the vessel had been sold for other sufficient reason,—as had happened in The St. Jago de Cuba,—and the proceeds were in the admiralty court. In Ramsay v. Allegre, 12 Wheat. 611, 6 L. Ed. 746, decided in 1827, the court, speaking by Chief Justice Marshall, in an opinion of half a dozen lines refused to permit a libel in personam for materials furnished in a home port in a case where the libelant had not surrendered a negotiable note given for the debt, "it not being necessary to consider the general question of jurisdiction." See Andrews v. Wall, 3 How. 568, 573, 11 L. Ed. 729. Believing that the court was drifting almost imperceptibly from the true principles of maritime law, and feeling the responsibility arising from his silent concurrence in the opinion in The General Smith and from his own opinion in The St. Jago de Cuba, Mr. Justice Johnson delivered an elaborate concurring opinion, in which he maintained that the limitations of admiralty jurisdiction were the same in America as in England. He vigorously condemned the language of the opinion in The General Smith, the decision in The Sandwich, and the reasoning of De Lovio v. Boit. The opinions of Mr. Justice Story have prevailed all along the line, but there is no doubt that Mr. Justice Johnson clearly established as a matter of history that in permitting a libel in personam

where he denied a libel in rem the former had asserted a doctrine hitherto unknown to any law. The opinion of the chief justice in Ramsay v. Allegre reopened the question which might have been supposed to be closed by the opinion of Mr. Justice Story in The General Smith. In Peyroux v. Howard, 7 Pet. 324, 8 L. Ed. 700, the court sustained a libel in rem for repairs in a case where a lien for them was given by the local law. This decision is, of course, opposed to the rule established in England by the common-law courts, and in effect it went far to give a lien to the domestic materialman, inasmuch as a lien is not uncommonly given him by the local law. Mr. Justice Johnson was then a member of the court, but apparently thought it unnecessary to dissent. It is hard to see how he can have agreed with either the decision or the opinion. In the latter but little attention was paid to the question of jurisdiction, and the dictum in The General Smith was followed, the statement there made concerning the difference between foreign and domestic repairs being repeated. The real contest in the case arose from a doubt whether the waters in which the vessel plied, being those of the Mississippi river, were within the admiralty jurisdiction. In Waring v. Clarke, 5 How. 441, 12 L. Ed. 226, a libel in rem for a collision which took place above the ebb and flow of the tide and within the body of the county was sustained. The general limits of the English admiralty jurisdiction were for the first time specifically repudiated by the supreme court against the single dissent of Mr. Justice Woodbury. The particular matter involved does not concern us here, but the decision is noteworthy for the fact just stated. In New Jersey Steam Nav. Co. v. Merchants' Bank of Boston, 6 How. 344, 12 L. Ed. 465, the jurisdiction of the court of admiralty over maritime contracts in general by libels in personam was sustained after full consideration, thus finally establishing as settled law another of the dicta in The General Smith. In Bogart v. The John Jay, 17 How. 399, 15 L. Ed. 95, the jurisdiction of the admiralty court to enforce payment of the mortgage of a vessel by its condemnation was denied. Mr. Justice Wayne said that the cause of the denial was not the jealousy of the courts of common law. But his reference to English courts and cases makes it probable that the jurisdiction would have been admitted if the jealousy had not existed in the past.

So imperfectly did the most experienced judges of this country understand the relation of the English courts of common law to those of admiralty that in Carrington v. Pratt, 18 How. 63, 69, 15 L. Ed. 267, Mr. Justice Nelson referred to Stainbank v. Fenning, 11 C. B. 51, as establishing a precedent of substantive admiralty law that a master can pledge the credit of a ship only by a bottomry bond. The English decision referred to was, as has been shown, simply the result of a curtailment of English admiralty jurisdiction, to which the admiralty courts of the United States were not submitted. In spite of the doubt expressed in Ramsay v. Allegre, the proposition stated in The General Smith, viz., that repairs made in a foreign port generally give a lien enforceable in a court of admiralty, while repairs made in the home port of the vessel give no such lien, has been fully established in the federal courts. Peyroux v. Howard, 7 Pet.

324, 341, 8 L. Ed. 700; New Jersey Steam Nav. Co. v. Merchants' Bank of Boston, 6 How. 344, 391, 12 L. Ed. 465; The St. Lawrence, 1 Black, 522, 17 Am. Dec. 180; The Lottawanna, 21 Wall. 558, 22 L. Ed. 654; The Edith, 94 U. S. 518, 24 L. Ed. 167; The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498, 37 L. Ed. 345. Yet into so great confusion had this distinction brought the courts that fifty years after The General Smith was decided, in The Lottawanna, 20 Wall. 201, 219, 22 L. Ed. 259, Mr. Justice Clifford said:

> "The bench and bar have come to doubt whether the decision that a maritime lien does not arise in a contract for repairs and supplies furnished to a domestic ship is correct, as it is clear that the contract is a maritime contract, just as plainly as the contract to furnish such repairs and supplies to a foreign ship or to a domestic ship in the port of a state other than that to which the ship belongs." Page 219, 20 Wall., and page 259, 22 L. Ed.

In a later decision made in the same case—The Lottawanna, 21 Wall. 558, 22 L. Ed. 654—the whole subject was reviewed, and the distinction stated in The General Smith was sustained against the dissent of Mr. Justice Clifford, who criticised The General Smith severely. Since The Lottawanna the distinction has often been referred to, and has never again been questioned. The reasoning upon which it has been rested has varied, however, and the variety in the reasoning has not always been recognized.

First. The distinction has been rested upon the theory that the general maritime law gives a lien in one case and denies it in the other. Thus, in Peyroux v. Howard, 7 Pet. 324, 341, 8 L. Ed. 700, it was said:

> "Where the repairs have been made or necessaries furnished to a foreign ship, or to a ship in the ports of a state to which she does not belong, the general maritime law gives a lien on the ship as security, and the party may maintain a suit in the admiralty to enforce his right. But as to repairs or necessaries in the port or state to which the ship belongs the case is governed altogether by the local law of the state, and no lien is implied unless it is recognized by that law."

See New Jersey Steam Nav. Co. v. Merchants' Bank of Boston, 6 How. 344, 391, 12 L. Ed. 465.

In Ferry Co. v. Beers, 20 How. 393, 401, 402, 15 L. Ed. 961, it was said:

> "In considering the foregoing description, it must be borne in mind that liens on vessels incumber commerce and are discouraged; so that, where the owner is present, no lien is acquired by the materialman; nor is any where the vessel is supplied or repaired in the home port."

In Maguire v. Card, 21 How. 248, 251, 16 L. Ed. 118, it was said:

> "We have at this term amended the twelfth rule of the admiralty so as to take from the district courts the right of proceeding in rem against a domestic vessel for supplies and repairs which had been assumed upon the authority of a lien given by state laws, it being conceded that no such lien existed according to the admiralty law."

And in The Edith, 94 U. S. 518, 520, 24 L. Ed. 167:

> "The repairs having been made on a domestic vessel in her home port, there was no lien for them by the maritime law."

See, also, The St. Lawrence, 1 Black, 522, 529, 531, 17 L. Ed. 180; The Belfast, 7 Wall. 624, 643, 19 L. Ed. 266.

Yet other opinions of the supreme court have recognized that the general maritime law gives a lien for repairs alike upon a foreign and a domestic vessel. Thus, in the Lottawanna, 21 Wall. 558, 571, 22 L. Ed. 654, it was said by Mr. Justice Bradley, in delivering the opinion of the court:

"By the general maritime law, those who furnish necessary materials, repairs, and supplies to a vessel upon her credit have a lien on such a vessel therefor, as well when furnished in her home port as when furnished in a foreign port."

See, to the same effect, The Kalorama, 10 Wall. 204, 212, 19 L. Ed. 941.

The court thus recognized that in denying a lien for domestic repairs the law of the United States differs from the general maritime law. It defended the American practice by saying, "No one doubts that every nation may adopt its own maritime code," and, "according to the maritime law as accepted and received in this country, we feel bound to declare that no such lien exists"; i. e., for domestic repairs. 21 Wall. 572, 578, 22 L. Ed. 654. This is to declare a difference between the maritime law of the United States and that of other countries without giving a reason therefor. It is simply stare decisis. Perhaps this was all that Mr. Justice Bradley meant to do. Yet into his reasoning crept this statement:

"The proposition, therefore, that by the general maritime law a lien is given in cases of the kind now under consideration, does not advance the argument a single step, unless it be shown to be in accordance with the maritime law as accepted and received in the United States. It certainly has not been the maritime law of England for more than two centuries past. Whether it is the maritime law of this country depends upon questions which are not answered by simply turning to the ordinary European treatises on maritime law, or the codes or ordinances of any particular country." 21 Wall. 574, 22 L. Ed. 654.

As has been shown, the learned justice here fell into historical error. The admiralty law of England certainly gave a lien or right to proceed against the ship for domestic repairs from the earliest times of which we have record, though that lien, as well as the lien for foreign repairs, was denied enforcement for more than two centuries by the prohibitions of the courts of common law. Thus, in The Albany, 4 Dill. 439–441, Fed. Cas. No. 131, Judge Dillon said:

"It is equally well known that this principle [lien for domestic repairs] has not been adopted as the law of England; or, rather, after having obtained in the admiralty courts of that country for some time, it was overturned by the hostility of the common-law courts;" "the principle of the civil law in this respect having been, as above observed, overthrown by the early hostility of the common-law courts to the admiralty jurisdiction."

Had Mr. Justice Bradley, in The Lottawanna, undertaken to give a reason for the distinction between the American maritime law on the one hand and that of the world at large, including the admiralty law of England on the other, it is likely that he would have fallen into that confusion between English admiralty jurisdiction and substantive law which has already been pointed out.

Second. A modification of the theory just stated, viz., that the general maritime law gives a lien for foreign, but not for domestic re-

pairs, may perhaps be found in The General Smith itself, as explained by Mr. Justice Story's observations in The Jerusalem. In the latter case Mr. Justice Story had no doubt that "by the general maritime law every contract of the master for repairs and supplies imports an hypothecation"; but in The General Smith he held that the general maritime law did not apply in case of a domestic vessel, although the court of admiralty had jurisdiction of the contract. A lien for domestic repairs could be created only by municipal law. In other words, the general maritime law was supposed to give a lien alike upon foreign and domestic vessels, but did not apply in the case of the latter. To this argument it may be answered that, before the distinction between foreign and domestic repairs was established in the courts of the United States, no courts had ever recognized the distinction, except perhaps those of Scotland; not the continental courts, not the English court of admiralty, all which courts recognized the lien in both cases; not the English court of common law, which denied the lien in both cases, and refused to permit the court of admiralty to enforce it in either case. The theory of Judge Story, not clearly expressed, and perhaps not very clearly thought out, seems to have been this: The general maritime law regulates the contracts of foreign vessels, while those of domestic vessels are regulated by municipal law. Of this theory it may be observed: (a) That it was new. No court had suggested the distinction, and generally the court of a country administers the same law to all suitors, at least as to domestic transactions. (b) The words "foreign" and "domestic" are ambiguous. Judge Story did not hold that in a federal court sitting in Massachusetts the lien given by the general maritime law was excluded in case of Massachusetts vessels or in case of Massachusetts materialmen and admitted in other cases. He enforced the lien against a Massachusetts vessel if the materials were supplied elsewhere, and he enforced it in favor of a Massachusetts materialman if the vessel was foreign to Massachusetts. Whether he would have denied it to a French materialman if the vessel also was French and the supplies were furnished in France, is doubtful. See The Maud Carter (D. C.) 29 Fed. 156; The Brantford City, Id. 373, 384. The case could hardly arise, except where the vessel had been sold for some other cause, and the proceeds were in court for distribution. A distinction in the applicability of municipal law like that suggested is probably unique. (c) Can it be said that "by the general maritime law every contract of the master for repairs and supplies imports an hypothecation," but that the general maritime law does not apply to repairs on a domestic vessel? Is not this to say either (1) that the general maritime law gives a lien in one case, and not in the other, or (2) that the general maritime law has no application to domestic repairs,—i. e., that the contract is not maritime, which Judge Story said it was. It seems that there is no middle ground.

Third. An ingenious variation of the theory that the distinction between foreign and domestic repairs was based upon a distinction in the general maritime law is to be found in The St. Lawrence, 1 Black, 527, 17 L. Ed. 180. Chief Justice Taney said that the judiciary act of 1789 "left no discretionary power in the admiralty courts or

in the superior court in relation to the modes and forms of proceeding. And it is evident that, if the courts of admiralty in this country used the process in rem, or process by attachment of the property in all cases in which it was authorized in countries governed by civil law, it would unavoidably in some cases come in collision with the common-law courts of the state where the parties resided and where the property was situated, and where other parties besides the owners or builders or equippers of the ship might have an interest in or a claim upon the property, which they had a right to assert in the courts of the state. But this difficulty was soon seen and removed. And by the act of May 8, 1792 (1 Stat. 275), these forms and modes of proceeding are to be according to the principles, rules, and usages. which belong to courts of admiralty, as contradistinguished from courts of common law, and these forms and modes of proceedings made subject to such alterations as the respective courts might deem. expedient, 'or to such regulations as the supreme court of the United States shall think proper from time to time by rule to prescribe to. any circuit or district court concerning the same.'" "It was manifestly proper, and perhaps necessary, that this power should be confined to the (supreme) court; for, it being the province of this court to determine what cases came within the admiralty and maritime jurisdiction of the United States, its process and mode of proceeding in such cases should be so framed as to avoid collision with the state authorities where rights of property were involved, over which the state had a right to legislate without trespassing upon the authority of the general government. The power was, therefore, given to the court, not only to make rules upon this subject, but to make them. from time to time, so that, if any new difficulty should arise, it might be promptly obviated, and the modes of proceeding and the process. of the admiralty courts so molded as to accomplish that object. The case of The General Smith, 4 Wheat. 438, 4 L. Ed. 609, was decided. upon these principles, and the right to proceed against the property regarded as a mere question of process, and not of jurisdiction. And the court held that where, upon the principles of the maritime code,. the supplies are presumed to be furnished on the credit of the vessel,. or where a lien is given by the local law, the party is entitled to proceed in rem in the admiralty court to enforce it; but where the supplies are presumed by the maritime code to be furnished on the personal credit of the owner or master, and the local law gives him no lien, although the contract is maritime, yet he must seek his. remedy against the person, and not against the vessel. In either case the contract is equally within the jurisdiction of a court of admiralty. And it is obvious from this decision that the court considered the process in rem or priority given for repairs or supplies. to a domestic vessel by the courts of admiralty, in those countries. where the principles of the civil law have been adopted, as forming no part of the general maritime code, but as local laws, and therefore furnishing no precedent for similar cases where the local law is otherwise. Consequently they form no part of the admiralty and maritime jurisdiction conferred on the government of the United States." 1 Black, 528, 529, 17 L. Ed. 180. This citation, and the opinion in

The St. Lawrence, as a whole, show that the learned chief justice believed that the contract for furnishing supplies, whether in a domestic or in a foreign port, was, in its nature, maritime. He recognized that in continental countries generally there existed "process in rem or priority given for repairs or supplies," both in the case of domestic and foreign vessels; and, further, that even the English courts knew no difference between them. He justified the existence of the American practice of admitting the lien in case of foreign repairs and denying it in case of domestic repairs upon the ground that the lien was matter of remedy, and that to admit it in the case of domestic repairs would introduce a conflict between the laws of the state and of the nation. Moreover, he asserted that this principle was the ratio decidendi of The General Smith. Ingenious as was his explanation, yet it was unsound. The "maritime code," which the learned judge evidently supposed was in general acceptation, does not regard whether the supplies are presumed to be furnished on the credit of the vessel or not. It makes no presumptions in any case that supplies are furnished on the personal credit of the owner or master. It admits "process in rem or priority given for repairs or supplies" alike to a domestic and to a foreign vessel for the same reason, and on the same general principles, though the lien for foreign supplies may be preferred to that for domestic. Such is the law of the continent in general. Such was the law of the English court of admiralty. It is at least extremely doubtful if the principles of the civil law, "forming no part of the general maritime code," have much to do with the actual practice of continental countries in dealing with a lien for repairs and supplies. Again, it is entirely clear that The General Smith was not in fact decided upon the principles enunciated by Chief Justice Taney. Mr. Justice Story did not rest the distinction between foreign and domestic repairs upon any fear of a conflict between federal and state laws, but upon the broad principles of maritime law recognized generally. His meaning is clear, and it was not that attributed to him by Chief Justice Taney. Judge Story had no notion that the supreme court, of its mere motion, was giving a remedy in rem in case of a foreign vessel, and, of the same mere motion, was denying it in case of a domestic vessel for fear of conflict with the state courts. See the criticism of Chief Justice Taney's explanation by Mr. Justice Clifford in The Lottawanna, 21 Wall., at page 593, 22 L. Ed. 654.

Fourth. The distinction between foreign and domestic repairs has been supported upon an analogy supposed to exist between the lien for repairs and that given by the express hypothecation of a bottomry bond. In The Grapeshot, 9 Wall. 129, 19 L. Ed. 651, the libel was on a bottomry bond, and the opinion made little distinction between the conditions in which such a bond is binding and those which give rise to the ordinary lien for repairs and supplies. After a discussion of the case of the lien, it was said:

"We have been induced to state this doctrine of implied hypothecation somewhat fully, not only because it seemed desirable to correct a common misunderstanding of these cases, but because of the close analogy in origin, effect, and incidents between implied hypothecation and express hypotheca-

tion by bottomry. It is, indeed, difficult to trace, either in reason or in the authorities, any marked line of discrimination between them."

Finally, the court stated its conclusions in the form of a proposition:

"Liens for repairs and supplies, whether implied or express, can be enforced in admiralty only upon proof made by the creditor that the repairs or supplies were necessary, or believed, upon due inquiry and credible representation, to be necessary."

See Pratt v. Reed, 19 How. 359, 361, 15 L. Ed. 660.

Yet the wide difference between a bottomry bond and the ordinary lien for supplies is stated by Mr. Justice Curtis in The Ann C. Pratt, 1 Curt. 340, 350, Fed. Cas. No. 409:

"One method of determining whether both the implied lien and the express hypothecation by way of bottomry can be intended to exist together is to consider that the first had for its object to secure the repayment of a loan of money, which is absolutely to be repaid, either upon demand or at a stipulated time, and for which the master may pledge the security of the vessel, the owners, and himself; while a loan on bottomry does not oblige the owner personally, is to be repaid only on condition of surviving the perils, the risk of which the lender assumes, and constitutes, as the writers on maritime law have so emphatically declared, an obligation of a distinct and peculiar kind. It is true that in both cases liens exist; but the one is implied by law, the other is created by the act of the master; the one is security for a debt of the owners and the master, the other is a right to receive a sum of money out of the thing at risk, in case it should survive the perils, the hazard of which is assumed by the lender. The one is merely a collateral security for a simple loan; the other is a transaction standing quite by itself, not capable of being analyzed into a loan and a mortgage to secure it, and a contract of insurance, and another of partnership, undique collatis membris, but simply a contract of bottomry, unlike all of them, and resembling nothing, and being consistent with nothing, but itself."

It is impossible to state the wide difference between the two liens more strongly. See, to the same effect, Carrington v. Pratt, 18 How. 63, 67, 15 L. Ed. 267.

The confusion between bottomry and the simple lien doubtless owes its origin in considerable measure to that rule of the English common-law courts which made suits on a foreign bottomry bond the only suits for repairs and supplies cognizable in the English admiralty court. The limits of English admiralty jurisdiction were again transmuted into rules of substantive American admiralty law.

It has thus been shown that the federal courts have firmly established that there is a distinction in the matter of lien between repairs furnished in the home port of a vessel and repairs furnished in a port foreign to the vessel,—between what we have styled "domestic" and "foreign" repairs. It has been shown also that the distinction, whatever the reasons actually given for it, has arisen from a confusion between the theory of the maritime law, English and continental, and the limits imposed upon the English court of admiralty by the prohibitions issued by the English courts of common law. But, though the historical basis of the distinction is demonstrably unsound, the distinction has been established by competent authority, and cannot be abolished except by legislation. We have next to consider precisely what the distinction is, and what are the conditions under which an implied lien arises by American admiralty law. For the moment, liens given by local statutes are-

passed over. The conditions stated are: (1) The port must be foreign. The J. E. Rumbell, 148 U. S. 1, 11, 13 Sup. Ct. 498, 37 L. Ed. 345. (2) The repairs must be necessary. The J. E. Rumbell; The Grapeshot, 9 Wall. 129, 136, 19 L. Ed. 651. (3) They must be made on the credit of the vessel. Insurance Co. v. Baring, 20 Wall. 159, 163, 22 L. Ed. 250; The Emily B. Souder, 17 Wall. 666, 670, 21 L. Ed. 683. (4) The supplies could not be otherwise obtained. The Lulu, 10 Wall. 192, 19 L. Ed. 906. (5) The owner must be absent. Ferry Co. v. Beers, 20 How. 393, 401, 402, 15 L. Ed. 961. But the difficulty of enforcing these restrictions soon appeared.

First. The ports of another state were declared to be foreign ports, so that, as in the case at bar, a foreign port may be in full sight of the owner's office, accessible in 10 minutes by ferry and in a minute by telephone. Thus, repairs executed in New York City on a vessel owned in Buffalo or in Ogdensburg are deemed to be executed on a domestic vessel, while repairs on a vessel owned in Jersey City are deemed to be executed on a foreign vessel. Supplies furnished in Erie to a vessel owned in Philadelphia give no lien, but supplies furnished in Camden give one. See The General Burnside (C. C.) 3 Fed. 228. The vessel may have been taken across the river for the express purpose of creating a lien. See The William Cook (D. C.) 12 Fed. 919. The supplies may be furnished in sight of the owner as he sits in his office at home, yet the vessel may be in a foreign port. Considering that the lien is enforceable only in the federal courts, the distinction between foreign and domestic ports has become in the highest degree artificial. Again, the attempt to fix the home port of the vessel, as between the port of enrolment, the home of the charterer, the home of the general owner, the home of the majority of the owners, etc., shows the artificiality of the rule. The Jennie B. Gilkey (C. C.) 19 Fed. 127. The Thomas Fletcher (C. C.) 24 Fed. 375. So, where a vessel really domestic is by misrepresentation made to appear foreign, there is a lien. McAllister v. The Sam Kirkman, Fed. Cas. No. 8,658; The Walkyrien, 11 Blatchf. 241, Fed. Cas. No. 17,092.

Second. The repairs must be necessary. In Pratt v. Reed this condition was stated with great strictness. "It is only under very special circumstances, and in an unforeseen and unexpected emergency, that an implied maritime hypothecation can be created." 19 How. 361, 15 L. Ed. 660. But in The Grapeshot, 9 Wall. 129, 137, 19 L. Ed. 651, the expressions used in Pratt v. Reed were considerably modified. On page 141, 9 Wall., and page 651, 19 L. Ed., it was said that the repairs must be necessary, or believed to be so on due inquiry and credible representation. Necessity exists, however, if a prudent owner would order the repairs on the credit of the ship; and, if the master orders the supplies on the credit of the ship, necessity is sufficiently proved in favor of a materialman who acts in good faith. This, it is submitted, reduces the requirement of necessity for the repairs to a requirement that, in ordering them, the master is reasonably believed to be acting for the benefit of the vessel, and within the scope of his authority. The Gustavia, 1 Blatchf. & H. 189, Fed. Cas. No. 5,876.

Third. That credit must be given to the vessel is asserted. The Lottawanna, 20 Wall. 201, 219, 22 L. Ed. 259. But in the Patapsco, 13 Wall. 329, 333, 334, 20 L. Ed. 696, it was said:

"It is undisputed that The Patapsco was in a foreign port, and that the coal was ordered for her specifically by name, and delivered to the officers in charge of her. It is equally free from dispute that the supply of coal was necessary—indeed, indispensable—to enable her to make her voyage at all. In such a case the inference is that the credit was given to the vessel, unless it can be inferred that the master had funds, or the owners had credit, and that the materialman knew of this, or knew such facts as should have put him on inquiry." "If the credit was to the vessel, there is a lien, and the burden of displacing it is on the claimant. He must show affirmatively that the credit was given to the company to the exclusion of a credit to the vessel."

And in The Emily B. Souder, 17 Wall. 667, 670, 671, 21 L. Ed. 683, it was said:

"The presumption of law always is, in the absence of fraud or collusion, that, where advances are made to a captain in a foreign port, upon his request, to pay for necessary repairs or supplies to enable his vessel to prosecute her voyage, or to pay harbor dues, or for pilotage, towage, and like services rendered to the vessel, that they are made upon the credit of the vessel as well as upon that of her owners. It is not necessary to the existence of the hypothecation that there should be in terms any express pledge of the vessel, or any stipulation that the credit shall be given on her account. The presumption arises that such is the fact from the necessities of the vessel, and the position of the parties considered with reference to the motives which generally govern the conduct of individuals. Moneys are not usually loaned to strangers, residents of distant and foreign countries, without security, and it would be a violent presumption to suppose that such course was adopted when ample security in the vessel was lying before the parties."

The necessity arising in Jersey City from the absence of the owner in the "distant and foreign country" of New York is not to be spoken of seriously, yet this is the necessity which is made to create the lien. "The position of the parties considered with reference to the motives which generally govern the conduct of individuals" is the same whether the vessel is at Harlem or Hoboken. In view of the cases cited, it seems that the requirement of credit to the vessel amounts to no more than this: That the materialman must not have waived his ordinary lien. As was said by Mr. Justice Story in The Nestor, 1 Sumn. 73, 75, Fed. Cas. No. 10,126:

"It is, in the first place, said that here a personal credit was given to the master, excluding any credit to the owner or to the ship. Now, I agree that, if the libelant has given any exclusive personal credit to the master, he cannot afterwards, upon any change of circumstances or opinion, resort to the ship, or shift the responsibility over upon the owner. But prima facie the supplies of materialmen to a foreign ship—that is, to a ship belonging, or represented to belong, to owners resident in another state or country—are to be deemed to be furnished on the credit of the ship and the owners, until the contrary is proved."

So in Carrington v. Pratt, 18 How. 63, 68, 15 L. Ed. 267, it was said:

"Now, it is well settled that the lien implied by the general admiralty law may be waived by the express contract of the parties or by necessary implication, and the implication arises in all cases where the express contract is inconsistent with an intention to rely upon the lien."

Here the failure to look to the vessel is treated as a positive waiver of the lien, rather than a positive looking to the vessel as a prerequisite of the lien. In The George T. Kemp, 2 Low. 477, 481, Fed. Cas. No. 5,341, Judge Lowell said:

"I have never known a ship-chandler that did not prefer two securities to one; and it has been the usage of the trade to make their charges to the ship and owners, hoping and intending to have the security of both."

See Peyroux v. Howard, 7 Pet. 324, 344, 345, 8 L. Ed. 700; The Sidney L. Wright, 5 Hughes, 474, Fed. Cas. No. 6,082a; The H. B. Foster, 3 Ware, 165, Fed. Cas. No. 6,291; Jones v. The Ratler, Taney, 456, Fed. Cas. No. 7,490; The Prospect, 3 Blatchf. 526, Fed. Cas. No. 11,443; The Washington Irving, Fed. Cas. No. 17,244.

Inasmuch as the affirmative giving of credit to the vessel is not required by the maritime law in general, and is generally presumed in the United States, where the other necessary conditions exist, it seems that the requirement comes to no more than this: That the lien may be waived by the express or implied giving of credit exclusively to the owner or master. Where the supplies are ordered, not by the master, but by the owner, it is said that there must be some affirmative evidence that the credit of the vessel was pledged. The George Farwell, 43 C. C. A. 373, 103 Fed. 882; The Roanoke, 46 C. C. A. 618, 107 Fed. 743. But there need be no express statement. The Newport (D. C.) 107 Fed. 744; The Ella (D. C.) 84 Fed. 471, 477; The Stroma, 3 C. C. A. 530, 53 Fed. 281, 283, 284; The Havana, 35 C. C. A. 148, 92 Fed. 1007.

Fourth. It has been said that a necessity for pledging the credit of the vessel must exist to create the lien, but in The Lulu, 10 Wall. 192, 197, 19 L. Ed. 906, it was said:

"Where it appears that the repairs and supplies were necessary to enable the vessel to proceed on her voyage, and that they were made and furnished in good faith, the presumption is that the vessel, as well as the master and owners, is responsible to those who made the repairs and furnished the supplies, unless it appears that the master had funds on hand or at his command which he ought to have applied to the accomplishment of those objects, and that they knew such was the fact, or that such facts and circumstances were known to them as were sufficient to put them upon inquiry, and to show that, if they had used due diligence in that behalf, they might have ascertained that the master, under the rules of the maritime law, had no authority to contract for the repairs and supplies on the credit of the vessel." And again: "Where proof is made of necessity for the repairs and supplies, or for funds raised by the master to pay for the same, and of credit given to the ship, a presumption will arise," said the chief justice, "in the absence of evidence to the contrary, of necessity for credit. Remarks are made in two cases decided by this court quite at variance with that rule, but it is unnecessary to comment upon those cases, or to enter into any explanation of those remarks, as it is clear that, if they assert any different rule of decision, they are in that respect directly overruled." 10 Wall. 203, 19 L. Ed. 906.

See The Grapeshot, 9 Wall. 129, 138, 19 L. Ed. 651.

And in The Bertha M. Miller, 24 C. C. A. 641, 79 Fed. 365, 366, it was said by the circuit court of appeals for this circuit:

"The necessity of the supplies is presumed from their nature, and from the fact that the master orders them; and, in the absence of other facts, the necessity for binding the vessel may also be presumed. But if the material-

man knows that the captain has funds or means of his owners or of his own, credit to the vessel is not authorized, and no lien is created."

It has been suggested (see Cuddy v. Clement, 51 C. C. A. 288, 113 Fed. 454, 462) that necessity for pledging the credit of the vessel is presumed when supplies are ordered by the master, but that it must be shown when they are ordered by the owner. But is there not more than a mere presumption of necessity in the case first put? Let us suppose a vessel coaling in Jersey City under the eyes of her wealthy owner, whose ownership and wealth are known to the materialman and whose office is in a high building on the west side of New York City. In the absence of some agreement to the contrary, would not a lien arise if the coal was needed for the voyage and was furnished on the order of the master? I think so, and yet, if this be true, it is idle to talk of necessity for pledging the vessel as a condition of the existence of the lien. If no lien arises in the case put, what degree of distance and what restriction of assets is needed to create the lien? Does it exist as against a vessel of the Cunard Company in a port where the company is unrepresented? The necessity is precisely the same whether the coal is ordered by the owner or the master. In Cuddy v. Clement the court found that the contract for coal was made in fact on the credit of the owner; that is to say, that any lien on the vessel was waived. Upon the whole it seems that the fourth requirement amounts but to this: That there is no lien where the materialman knows, or ought to know, that the master has funds which he may properly apply to payment for the supplies. The requirement is one of reasonable good faith. If any more is required by Thomas v. Osborn, 19 How. 22, 31, 15 L. Ed. 534, the expressions in that case must be deemed modified by those in The Lulu. See Berwind v. Schultz (D. C.) 25 Fed. 912, a libel in personam.

Fifth. The requirement of the absence of the owner is the most difficult and important. It has been put upon two grounds entirely unconnected:

(a) In Ferry Co. v. Beers, 20 How. 393, 401, 15 L. Ed. 961, it was said:

"It must be borne in mind that liens on vessels incumber commerce, and are discouraged; so that, where the owner is present, no lien is acquired by the materialman; nor is any where the vessel is supplied or repaired in the home port. The lien attaches to foreign ships and vessels only in favor of the carpenter who repairs in a case of necessity and in the absence of the owner."

And in Pratt v. Reed, 19 How. 359, 361, 15 L. Ed. 660, it was said:

"These maritime liens in the coasting business and in the business upon the lakes and rivers are greatly increasing; and, as they are tacit and secret, are not to be encouraged, but should be strictly limited to the necessities of commerce which created them. Any relaxation of the law in this respect will tend to perplex and embarrass business, rather than furnish facilities to carry it forward."

This is to say that a secret lien is so undesirable that it can be allowed only in case of a necessity which is evidenced, in part at least, by the absence of the owner. In Pratt v. Reed the master was owner, and this fact, though not conclusive, was deemed to make

against the existence of the lien. The limitation is thus imposed, in part at least, for the benefit of third persons having claims on the vessel,—the mortgagee, the vendee, prior or subsequent, and the general creditor. See The Lottawanna, 21 Wall. 558, 571, 22 L. Ed. 654. For a favorable criticism of secret liens, see The Eliza Jane, 1 Spr. 152, Fed. Cas. No. 4,363.

(b) On the other hand, in The Valencia, 165 U. S. 264, 271, 17 Sup. Ct. 323, 325, 41 L. Ed. 710, it was said that:

"In the absence of an agreement, express or implied, for a lien, a contract for supplies made directly with the owner in person is to be taken as made 'on his ordinary responsibility, without a view to the vessel as the fund from which compensation is to be derived.'"

And in The Kalorama, 10 Wall. 204, 213, 214, 19 L. Ed. 941, it was said:

"It is no objection to his [the master's] authority that he acted on the occasion under the express instructions of the owner, nor will the lien of those who made the repairs and furnished the supplies be defeated by the fact that his authority emanated from the owner, instead of being implied by law." "When the owner is present, the implied authority of the master for that purpose ceases; but, if the owner gives directions to that effect, the master may still order necessary repairs and supplies, and, if the ship is at the time in a foreign port, or in the port of a state other than that of the state to which she belongs, those who make the advances will have a maritime lien, if they were made on the credit of the vessel." "Implied liens, it is said, can be created only by the master, but if it is meant by that proposition that the owner, or owners, if more than one, cannot order repairs and supplies on the credit of the vessel, the court cannot assent to the proposition, as the practice is constantly otherwise. Undoubtedly, the presence of the owner defeats the implied authority of the master, but the presence of the owner would not destroy such credit as is necessary to furnish food to the mariners, and save the vessel and cargo from the perils of the sea."

And the extended discussion in The Kate, 164 U. S. 458, 465–470, 17 Sup. Ct. 135, 41 L. Ed. 512, treats the lien as created by authority confided in the master by the owner. This is to say that the nonexistence of the lien in the presence of the owner arises from a want of authority in the master to bind the vessel when the owner himself is present. This appears to be the theory stated in The Lulu, 10 Wall. 192, 200, 19 L. Ed. 906, and in Insurance Co. v. Baring, 20 Wall. 163, 164, 22 L. Ed. 250, where want of authority is treated as the only limitation on the master's authority. See The Eclipse, 3 Biss. 99, Fed. Cas. No. 4,268; The Ludgate Hill (D. C.) 21 Fed. 431; The Isaac May, Id. 687; The Ella (D. C.) 84 Fed. 471; The Marion S. Harris, 29 C. C. A. 428, 85 Fed. 798; The North Pacific, 40 C. C. A. 510, 100 Fed. 490. It is this theory, and not (a), which seems now to be accepted by the federal courts. Even in The Mary Morgan (D. C.) 28 Fed. 196, where the absence of the owner as a condition of the lien was most strongly insisted on, it was admitted that the owner might create a lien by parol. See The Havana (D. C.) 54 Fed. 201. The confusion into which a conflict between the two theories brought the courts is illustrated by Thomas v. Osborn and other cases, where the master was owner in whole or in part. If the first theory be sound, there is no lien; if the second, the lien has a double authority. Upon theory (b), the

condition of the owner's absence is imposed wholly for his benefit, and may, therefore, be waived by him either expressly or by implication. His mortgagee or other creditor may be prejudiced by a secret lien, provided the creation of the lien was authorized by him. To this effect agrees the reasoning in cases like The Walkyrien, Fe¹. Cas. No. 17,092, which hold that there is a lien even in a domestic port, provided the materialman is reasonably deceived into believing the vessel to be foreign. If the requirement that the port be foreign is imposed for the benefit of any person other than the owner, it is hard to see why such person should be prejudiced by the misrepresentation of the owner and his agents. For the continental rule, see Valr. I, p. 120. Again, if the condition of the owner's absence exists only for the owner's benefit, and may be waived by him, then the other conditions mentioned above, or most of them, have the same object. Thus it would seem that necessity for credit need not be shown if the owner assents to the creation of the lien when the repairs are made. That the supplies were necessary to the vessel need not be shown, it seems, though doubtless they must be appropriate. It has not been established that the assent of the owner will, in the absence of statute, give a lien for domestic repairs. On the theory just stated, the owner's assent should be sufficient. If the presence of the owner in a foreign port ordinarily defeats the lien, but his assent to the creation of the lien while present and having means will create the lien there, then his assent, sufficiently proved, should create the lien even in the home port. The George Farwell, 43 C. C. A. 373, 103 Fed. 882, appears to be in point, though it must be admitted that the grounds of the decision are not perfectly clear. The charterer had its place of business in New York. By the charter it was bound to pay for repairs and keep the vessel clear of liens. The owner was of Ohio. The repairs were done in New York on the order of the charterer. The charterer agreed with the materialman orally for a lien, representing that it owned the vessel. The court sustained the lien on the ground that the materialman was justified in relying on the charterer's statement, which amounted to this: That the repairs were made on the order of the owner in the home port. The court can hardly have intended to allow the materialman to take the charterer's statement of the ownership, and at the same time to set up that the vessel belonged in Ohio, and so was repaired in a foreign port. It must, therefore, have meant to decide that an owner may give a lien for domestic repairs. It is true that the charterer was incorporated in New Jersey, but this seems to have been deemed immaterial, and it was neither urged nor suggested that the vessel belonged in New Jersey. See The Roanoke (D. C.) 101 Fed. 298; Id., 46 C. C. A. 618, 107 Fed. 743,—a case which arose out of similar facts. There the libelant supposed the charterer was a New York corporation, and yet both the district court and the court of appeals conceded that, if it had expressly agreed with the libelant for a lien, the lien would have bound the vessel. See, also, The Allianca (D. C.) 63 Fed. 726, 732; Taylor v. Com., Fed. Cas. No. 13,788; The Union Express, Fed. Cas. No. 14,363. The ordinary absence of a lien in the home port and its absence in a for-

eign port when the owner is present apparently have the same cause,
to wit, a want of authority given by the owner to the master sufficient for the creation of the lien. The Union Express, 1 Brown,
Adm. 537, Fed. Cas. No. 14,364. According to many cases, the personal order of the owner gives rise to a presumption that the supplies ordered are furnished on his personal credit; but this presumption, which probably arose from a confusion with the more reasonable
presumption that the master could not bind the vessel in the owner's
presence, would soon disappear if owners generally assented to a
lien upon their vessels for supplies and repairs ordered by themselves. The supposed analogy between the lien and a bottomry bond
leads to the same conclusion. Though the analogy be misleading,
yet the reference to it by the courts may show the line of their
reasoning. Now, the master cannot give a bottomry bond in the
home port, but the owner can do so. The Charles Carter, 4 Cranch,
328, 2 L. Ed. 636; The Draco, 2 Sumn. 157, Fed. Cas. No. 4,057.
And see Ames cases on admiralty 230, note. Necessity to borrow
need not be shown. Apparently the English court of admiralty requires proof of emergency in case of bottomry by owner. The Dunvegan Castle, 3 Hagg. Adm. 331; The Hersey, Id. 404. It is true
that the tendency upon the continent of Europe is greatly to limit
bottomry, if not to do away with it altogether, but no tendency is
shown to narrow the scope of maritime liens. On the whole, the
theory gains strength and is prevailing that the limitations upon the
lien exist for the sole benefit of the owner, and may be waived by
him either expressly or by implication. This theory is supported by
those cases in which a lien has been declared, though the supplies were
ordered by the owner himself in the home port of the vessel, provided they were put on board in a foreign port. The Agnes Barton,
26 Fed. 542. The lien exists even if the vessel was in the home port
at the time the supplies were ordered; The Hiram R. Dixon (D. C.)
33 Fed. 297. To give a lien for supplies ordered by the owner in
New York, the place of his residence, where the vessel is then lying,
because these supplies are, for the sake of convenience, forwarded to
Jersey City, and there taken on board by the vessel, is to make the
rights of the materialman depend upon a distinction without substantial difference. To say that the lien arises in such case because
the supplies are furnished "in a case of necessity and in the absence
of the owner," "in an unforeseen and unexpected emergency," because
"moneys are not usually loaned to strangers, residents of distant
and foreign countries," or because "of a reasonable impracticability
of obtaining (the supplies) on the credit of the owner," is not to reason conclusively. This conclusion is strengthened by the analogy
of statutory liens, the history of which is stated in The Glide, 167
U. S. 606, 17 Sup. Ct. 930, 42 L. Ed. 296. In their case: (1) The
port not only may be, but is ordinarily, domestic. (2) The repairs
and supplies are those covered by the statute, and need not be necessary, though probably they must be appropriate. (3) No credit need
be given to the vessel, though doubtless the lien may be waived,
either expressly or by implication. The Iris, 40 C. C. A. 301, 100
Fed. 104. (4) No necessity for pledging the credit of the vessel need

be shown.  (5) The owner need not be absent. He may order the repairs himself.

The history of maritime liens for supplies and repairs has thus been traced. Their origin is ancient, and not precisely ascertained. Whatever was their connection with bottomry, they were early limited by different conditions, and they produced different results. They were recognized, both in England and on the continent, to bind both domestic and foreign vessels, and have generally bound both upon the continent. Until confusion between jurisdiction and substantive law had bred ignorance of the latter, no one disputed that both were bound by the admiralty law of England, but that law was denied enforcement by the English courts of common law in the case of both foreign and domestic repairs (saving only cases of foreign bottomry and of a sale of the vessel for other sufficient reasons). In this country the colonial courts of admiralty, though theoretically bound by the English limitations, may yet have been less hampered in practice by prohibitions. When, after the adoption of the federal constitution, the federal courts, with much difference of opinion, came to disregard the limits of English admiralty jurisdiction, they yet did not free themselves altogether from the habits of thought which these limits had imposed. Questions of jurisdiction and of substantive law were thus confused here as well as in England, and that which the courts of admiralty had been forbidden to do by prohibition was believed to have been left undone voluntarily. Thus a distinction was established between foreign and domestic repairs, elsewhere unknown (except perhaps in Scotland), and this distinction was further confused by a distinction between libels in rem and in personam. From this confusion has emerged in the United States a theory, not consistently developed as yet, that, subject to not a few presumptions and counter presumptions, exceptions and subexceptions, a vessel is ordinarily liable for her repairs and supplies. Here the personification of the vessel has been more fully developed than in England, and it has been made the foundation of our admiralty law. (This personification, so far as it existed in England, has recently been denied effect in The Gemma (1899) P. D. 285, with what results to the English admiralty law it remains to discover.) The exceptions to this general rule of the vessel's liability for repairs and supplies exist for the protection of the owner of the vessel, and for his protection only, although, if the exception is established, the materialman is deemed to have waived his lien, and this waiver may be availed of by other creditors of the owner. If the owner refuses to permit the creation of the lien or right to proceed against the vessel, and this refusal is or ought to be known to the materialman, no lien arises, or else it is deemed to be waived. From the existence of certain circumstances this refusal of the owner and the consequent nonexistence or waiver of the lien are presumed, but the effect to be given these circumstances may vary with local customs. In any event, the assent of the owner to the existence of the lien, actual or reasonably implied, suffices for its creation.

It cannot be pretended, of course, that this review and discussion of the history and law of maritime liens for repairs and supplies is

complete. It is hoped that what has been said has cleared up some misconceptions, and will help both to a better understanding of the subject and to its further study.

It remains to consider the case at bar in the light of the results already reached. Did this owner assent to the lien in this case? Did he lead the materialman to believe in his assent? Ought the materialman to have known that the owner dissented? All the circumstances by which the lien is ordinarily created or from which it is ordinarily presumed are here present,—the foreign port, the order of the master, the absence of the owner, the need of supplies if the vessel is to navigate, the necessity of pledging the credit of the vessel if the supplies are to be procured. To this the defense is: Want of authority in the master, known to the materialman, to create the lien upon the vessel. What is meant by the master's want of authority in a matter like this? No law ever provided baldly that the repairer of a vessel should always have a lien. My vessel lies at a wharf out of repair, and she is repaired by a mere trespasser. In general he has no lien under any system of law. The repairs must be ordered or authorized by some one in authority, and the master is ordinarily such a person either at home or abroad; that is to say, the master ordinarily has authority to license the act of repairing. If authorized by him, it is no longer a trespass. If the owner has given the master express authority to contract for repairs or supplies, the owner is bound personally. If the repairs are within the scope of the authority which the maritime law attributes to the master, and that authority has not been specially limited, the owner or the charterer, that person of whom the master is agent, is personally bound to pay for the repairs. All this is a development of the ordinary law of agency. By English law it seems that the owner is bound, even if the advances for repairs, etc., are made in a domestic port. Abb. Shipp. (7th Am. Ed.) 186; Arthur v. Barton, 5 Mees. & W. 138; Johns v. Simons, 2 Q. B. 425; The Lochiel, 2 W. Rob. Adm. 45. See Speerman v. Degrave, 2 Vern. 643. The owner is bound by the act of his authorized agent, as if he had ordered the repairs himself. If the owner is actually present in the port, something more than the ordinary implied authority of the master may be necessary to bind the owner for repairs, even if not for supplies. By a peculiarity of the maritime law the master also is bound individually, but this peculiarity need not concern us here. Whatever be the authority ordinarily given to a master, if in the particular case he has no authority to bind his principal, and if the material man knows this want of authority, the owner or principal cannot be held. This also is the familiar law of agency. So, if the master has no authority to permit the materialman to make the repairs, and the materialman, who makes them on the master's order, knows this want of authority, it is hard to see how he can justify his trespass. If he knows that the master is forbidden to create a debt binding upon the owner, he cannot hold the owner. If he knows that the master is forbidden to permit the creation of a lien on the ship, he cannot claim a lien. Put the case in another way: If the materialman knows that the master is forbidden to repair, even in a foreign port, it would seem

that he cannot proceed against either owner or vessel. If he knows that the master is permitted to repair, but only upon the condition that the repairs are chargeable neither to the owner nor to the vessel, then, if he makes the repairs on the order of the master, and without objection, it would seem that he impliedly waives his lien upon the vessel. See Emerigon, in Hall's Maritime Loans, 89, 90. It is true. that the maritime law and its codes give great power to the master. But these powers must be subject to enlargement and diminution by agreement between owner and master. In general, the latter cannot hold the former by the general rules of maritime law against an express agreement duly entered into between them, and it is hard to see how he can bind him in contravention of the agreement to a third person who has knowledge of its terms. We need not here discuss the statutory lien. The terms of the statute may expressly give to the master authority to create a lien, whether the owner authorizes it or not. See The Kate, 164 U. S. 458, 470, 17 Sup. Ct. 135, 41 L. Ed. 512; The S. M. Whipple (D. C.) 14 Fed. 354.

The mere fact that a vessel is known to be under charter does not deprive of his lien one who, in a foreign port, furnishes it with supplies on the order of the master. The George Dumois, 15 C. C. A. 675, 68 Fed. 926; The Philadelphia, 21 C. C. A. 501, 75 Fed. 684. But if a charter or other contract limits the authority of the master in the matter of buying coal, and forbids him to buy it except upon the ,personal credit of the charterers only (and perhaps on his own personal credit), and if the libelant has notice of·this limitation, it would seem that the lien either does not arise or is impliedly waived. In The Kate, 164 U. S. 458, 17 Sup. Ct. 135, 41 L. Ed. 512, Mr. Justice Harlan said:

"Courts of admiralty will not recognize and enforce a lien upon a vessel when the transaction upon which the claim rests originated in the fraud of the master upon the owner, or in some breach of the master's duty to the owner, of which the libelant had knowledge, or in respect of which he closed his eyes without inquiry as to the facts. If no lien exists under the maritime law, when supplies are furnished to a vessel upon the order of the master under circumstances charging the party furnishing them with knowledge that the master cannot rightfully, as against the owner, pledge the credit of the vessel for such supplies, much less is one recognized under that law where the supplies are furnished, not upon the order of the, master, but upon that of the charterer, who did not represent the owner in the business of the vessel, but who, as the claimant knew, or by reasonable diligence could have ascertained, had agreed himself to provide and pay for such supplies, and could not, therefore, rightfully pledge the credit of the vessel for them."

The learned justice also quoted from an opinion rendered by Judge Sprague in this court in The Sarah Starr, 1 Spr. 453, 455, Fed. Cas. No. 12,354, where it was said:

"In giving credit to the vessel and owners, the materialman should act in good faith, and he would not be deemed to act in good faith if he knew that the master had funds wherewith to pay for the supplies, or if facts were known to him which should create suspicion, and put him upon inquiry, when such inquiry would have led to the knowledge that the master had funds, and has no right, therefore, to obtain supplies on credit. That is, if the materialman had had knowledge that the master was acting in bad faith towards his employers, or knew of circumstances which ought to admonish him to make inquiry that would have led to such knowledge, then he would be af-

fected with bad faith, as colluding with the master, and aiding him in violating his duty to his owner. But if the materialman had no reason to suppose that the master was violating his duty in obtaining a credit, he might, upon request of the master, trust to the vessel and owners, and a lien would thereby be created." 164 U. S. 469, 17 Sup. Ct. 139, 41 L. Ed. 512.

See The Columbus, 5 Sawy. 487, Fed. Cas. No. 3,044; Swift v. The Albus, Fed. Cas. No. 13,694; The S. M. Whipple (D. C.) 14 Fed. 354; The Alvira (D. C.) 63 Fed. 144.

In the Bombay (C. C.) 38 Fed. 863; Id. (D. C.) 38 Fed. 512, it is not stated if the libelants knew that the vessel was under charter, and it is said expressly that they had no notice of its provisions. By the French law it seems that the vessel is not bound for supplies ordered by the charterer unless the supplies are needed for the ship, apart from the special needs of the charterer, and unless the owner, if present, would have ordered them. Desj. I, 256.

One argument in support of the master's authority to bind the vessel, even when expressly forbidden to do so, should not be overlooked. Suppose the charter provides that the owner shall pay the wages of the crew. To put this charge upon the charterer is not uncommon. Suppose the crew to have knowledge that the charter forbids the charterer to create a lien for wages, it may be asked if the crew would lose their lien. In the case put they would have that knowledge of the master's limitation of authority which the materialmen are held to have had in the case at bar. Why should they fare any better? It is probable that the seamen's lien on the vessel would exist even in the case put,—that is to say, even though they knew that the master, in permitting it to arise, was guilty of bad faith. The seamen would be protected, however, not by the logical result of admitted principles of general law, but by reason of the favor shown to them in a court of admiralty. The wages of seamen are secured upon the vessel in many jurisdictions by a statute which admits of no exception. Taking it as established, then, that the vessel is not bound even for necessary supplies furnished in a foreign port on the master's order, provided the materialman knows that the master is forbidden to create a lien for the purpose, we next consider if the master's authority was so limited in this case. The limitation here contended for by the claimant is found in the charter party, whose material parts are as follows:

"(2) The owner shall provide and pay for all the provisions, water, wages, and consular shipping and discharging fees of the captains, officers, engineers, firemen, and crew of said tug; shall pay for the insurance of the same; also for all ship, cabin, engineroom, and deck stores; and maintain said tugs in a thoroughly efficient state in hull and machinery for and during the service, and including the necessary hawsers and lines for mooring and towing.

"(3) The charterer shall provide and pay for all the coals, port charges, pilotages, agencies, and commissions, and all other charges whatsoever, except those before stated, and shall likewise, in case the owner deems it necessary to insure said tugs, or any of them, against war risks, pay the additional cost of the premium for such insurance."

"The charterer shall accept and pay for all coals in the tugs' bunkers on delivery, and the owner shall, on the expiration of this charter party, pay for all coal left in the bunkers, each at the current market prices at the port of Boston when said tugs are delivered to them."

"(6) The captains of said tugs, although appointed by the owner, shall be

under the orders and direction of the charterer as regards employment, agency, or other arrangements, and the charterer hereby agrees to indemnify the owner from all consequences or liabilities that may arise from any irregularities in ship's papers, or from the captains signing bills of lading, or otherwise complying with the charterer's directions."

The court has to consider if this language is (1) a limitation on the authority of the captain, or (2) merely a contract made by the charterer with the owner that the former will pay for supplies in the first instance, and, in case this is not done for any reason, will reimburse the owner for supplies paid for by the latter. The language of the clauses might not unreasonably bear either construction. On general principles there is much to be said in support of the contention that a clause in a charter like that above quoted, providing that the charterer shall supply the vessel with coal, is intended merely as a contract between charterer and owner, and does not limit the general authority of the master to order coal for the vessel upon the vessel's credit in a foreign port. In The Kate, above cited, the provisions of the charter were much like those in this case, and the supreme court said at page 465, 164 U. S., page 138, 17 Sup. Ct., and page 512, 41 L. Ed.:

"We are of opinion that, as the libelant knew, or, under the circumstances, is to be charged with knowledge, that the charter party under which the Kate was operated obliged the charterer to provide and pay for all the coal needed by that vessel, no lien can be asserted under the maritime law for the value of coal supplied under the order of the charterer, even if it be assumed that the libelant in fact furnished the coal upon the credit both of the charterer and of the vessel. As the charterer had agreed to provide and pay for all coal used by the vessel, he had no authority to bind the vessel for supplies furnished to it. His want of authority to charge the vessel for such an expense was known or could have been known to the libelant by the exercise of due diligence on its part. Under the circumstances, the libelant was not entitled to deliver the coal on the credit of the vessel, and its attempt to hold the vessel liable is in bad faith to the owner. The law cannot approve or encourage such an attempt to wrong the owners of the vessel. Neither reason nor public policy forbade the owner and the charterer from making the arrangement evidenced by the charter party of December 15, 1892. The master of a ship is regarded as 'the confidential servant or agent of the owners, and they are bound to the performance of all lawful contracts made by him relative to the usual employment of the ship, and the repairs and other necessaries furnished for her use. This rule is established as well upon the implied assent of the owners as with a view to the convenience of the commercial world.' The Aurora, 1 Wheat. 95, 101, 4 L. Ed. 45. 'The vessel must get on,' and 'the necessities of commerce require that, when remote from the owner, he [the master] should be able to subject his owner's property to that liability, without which, it is reasonable to suppose, he will not be able to pursue his owner's interests.' The St. Jago de Cuba, 9 Wheat. 409, 416, 6 L. Ed. 122; The J. E. Rumbell, 148 U. S. 1, 13 Sup. Ct. 498, 37 L. Ed. 345. When, therefore, supplies are furnished to a vessel in a foreign port upon the order of the master, nothing else appearing, the presumption is that they were furnished on the credit of the vessel and of the owners, and an implied lien is given. But no such necessity can be suggested, and no such reasons urged, in support of an implied lien for supplies furnished to a charterer, when the libelant at the time knew, or by such diligence as good faith required could have ascertained, that the party upon whose order they were furnished was without authority from the owner to obtain supplies on the credit of the vessel, but had undertaken, as between itself and the owner, to provide and pay for all supplies required by the vessel."

There was a like charter in The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710, and the court said at page 270, 165 U. S., page 325, 17 Sup. Ct., and page 710, 41 L. Ed.:

"Although the libelants were not aware of the existence of the charter party under which the Valencia was employed, it must be assumed, upon the facts certified, that by reasonable diligence they could have ascertained that the New York Steamship Company did not own the vessel, but used it under a charter party providing that the charterer should pay for all needed coal. The libelants knew that the steamship company had an office in the city of New York. They did business with them at that office, and could easily have ascertained the ownership of the vessel and the relation of the steamship company to the owners. They were put upon inquiry, but they chose to shut their eyes and make no inquiry touching these matters, or in reference to the solvency or credit of that company."

See Beinecke v. The Secret (D. C.) 3 Fed. 665, quoted with approval by the supreme court in the last-named case; The Cumberland (D. C.) 30 Fed. 449, 455; The William Cook (D. C.) 12 Fed. 919; Neill v. The Francis (D. C.) 21 Fed. 921; The Solveig, 43 C. C. A. 250, 103 Fed. 322; The Stroma (D. C.) 41 Fed. 599; The Pirate (D. C.) 32 Fed. 486.

In other cases it was assumed that, if the materialmen had had knowledge of the existence of a charter like that in this case, he would have had no lien, although, as no knowledge on his part was established, the lien was allowed. The North Pacific, 40 C. C. A. 510, 100 Fed. 490; Norwegian S. S. Co. v. Washington, 6 C. C. A. 313, 57 Fed. 224; The Ellen Holgate (D. C.) 30 Fed. 125. These cases construe the language used in this charter to forbid the master to pledge the credit of the vessel for the supplies he orders. Many of these cases, and others heretofore cited, also hold that the materialman is affected by the limitations of the charter if he has notice of them. There is much authority for the proposition that this charter, if brought to the notice of the materialman, will prevent him from getting a lien. It is true that there is authority upon the other side, and that the opinions of the supreme court just cited are not quite explicit. In the City of New York, Fed. Cas. No. 2,758, the lien was upheld in the case of a charter like this. The vessel was in a really distant port, however, and was in such peril that the limitation imposed on the master's authority by the charter may have been treated as inapplicable within the intent of the parties. The opinion is short. See The Wm. Cook (D. C.) 12 Fed. 919, 920. In The Lucia B. Ives, Fed. Cas. No. 8,590, the lien was upheld, but whether in reliance on the express terms of the statute or upon a doubt as to the meaning of the charter is not clear. In The Monsoon, Fed. Cas. No. 9,716, decided by Judge Sprague, in which that distinguished judge upheld a lien upon a chartered vessel, it is doubtful if the decision was rested upon a supposed inability of the owner to limit the master's authority, or upon a construction of the charter in question. If the former, the case stands substantially alone; if the latter, it is opposed to the great weight of authority. See The H. B. Foster, 3 Ware, 165, Fed. Cas. No. 6,291; Rozo v. The Neversink, Fed. Cas. No. 12,079; The India (D. C.) 14 Fed. 476; Id. (C. C.) 16 Fed. 262. The language of some of the opinions last cited is not

clear, but the learned judges who delivered them did not mean to hold that a materialman could claim a lien for supplies furnished a vessel where he knew that the person ordering the supplies was expressly forbidden to permit the vessel to become bound for them.

That a chartered vessel is ordinarily bound for the price of supplies ordered for her use in a foreign port by the master was expressly decided in this circuit in the case of The Philadelphia, and this is the law where the charter is silent upon the subject. Where, however, the charter limitation is that found in this case, and where the coal is ordered, not in a port of distress, where it may reasonably be supposed that the further prosecution of the voyage is for the interest of the owner as well as for that of the charterer, I am of opinion that no lien exists.

Libel dismissed.